**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **NAKIA L. JONES,** | ) | **CASE NO.** |
| **13133 BERRY BOULEVARD** | ) | |
| **WARRENSVILLE HEIGHTS, OH 44128** | ) | |
| | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **JUDGE** |
| **vs.** | ) | |
| | ) | |
| **CITY OF WARRENSVILLE HEIGHTS** | ) | |
| **4301 WARRENSVILLE CENTER RD.** | ) | **COMPLAINT** |
| **WARRENSVILLE HEIGHTS, OH 44128** | ) | |
| | ) | |
| **and** | ) | |
| | ) | |
| **BRADLEY D. SELLERS, MAYOR** | ) | |
| **(in his individual and official capacities)** | ) | |
| **CITY OF WARRENSVILLE HEIGHTS** | ) | |
| **4301 WARRENSVILLE CENTER RD.** | ) | |
| **WARRENSVILLE HEIGHTS, OH 44128** | ) | |
| | ) | |
| **and** | ) | |
| | ) | |
| **WESLEY HAYNES** | ) | |
| **CHIEF OF POLICE** | ) | |
| **(in his individual and official capacities)** | ) | |
| **CITY OF WARRENSVILLE HEIGHTS** | ) | |
| **4301 WARRENSVILLE CENTER RD.** | ) | |
| **WARRENSVILLE HEIGHTS, OH 44128** | ) | |
| | ) | |
| **Defendants.** | ) | **Jury Demand Endorsed Hereon.** |

Now comes Plaintiff Nakia L. Jones and for her several causes of action against

Defendants states as follows.

**Background and Jurisdiction**

1. This is an action for violation of Plaintiff Nakia Jones's First Amendment Right to

   Freedom of Speech in that Plaintiff suffered an adverse employment action after

1

engaging in constitutionally protected speech and for state law claims for gender based harassment, gender based hostile work environment and retaliation for having engaged in activity protected under state antidiscrimination laws.

2.  At all times relevant hereto Mrs. Jones resided at the above captioned address and was employed by Defendant City of Warrensville Heights as a police officer, from August 2002 until her termination effective October 20, 2017.

3.  Defendant City of Warrensville Heights ("City") is located in Cuyahoga County, Ohio and is a municipal corporation duly organized under the laws of the State of Ohio with its business offices located at the above captioned address.

4.  Defendant Bradley D. Sellers was at all time relevant hereto the duly elected Mayor of Warrensville Heights.

5.  Defendant Wesley Haynes was at all times relevant hereto employed as the Chief of Police of Warrenesville Heights.

6.  Plaintiff brings these claims pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1343, 42 U.S.C. § 1983, the First and Fourteenth Amendment of the United States Constitution.

7.  Venue is proper for all of Mrs. Jones claims' pursuant to 28 U.S.C. § 1391(b) as all of the parties reside within the Northern District of Ohio, and all of the events giving rise to Mrs. Jones' claims occurred in this judicial district.

8.  Plaintiff raises a Federal Constitutional question over which this Court has original jurisdiction. Mrs. Jones' claims present federal questions over which this Court has jurisdiction pursuant to 28 U .S.C. § 1331; 28 U.S.C. § 1343; 42 U.S.C. § 1983.

9.  Defendants were, at all relevant times, acting under color of State law within the meaning of the Civil Rights Act of 1871, as amended, 42 U.S.C. §1983 ("§1983").

10. Pursuant to the First Amendment, a public employer cannot condition the terms and conditions of public employment on a basis that infringes upon an employee's constitutionally protected interest in freedom of expression and speech.

11. Defendants, at all times relevant hereto, were acting in relation to Mrs. Jones in employment matters.

12. This Court has jurisdiction over this action by reason of 42 U.S.C. §§2000e, *et seq.* ("Title VII"); and pursuant to the federal Civil Rights Act of 1871, as amended, 42 U.S. Code §1983 ("§1983").

13. This Court has pendent, supplemental and/or ancillary jurisdiction over Mrs. Jones' Ohio statutory and common-law claims by virtue of 28 U.S.C. §1367.

## Count I (Constitutional Violations)

14. All relevant, material and pertinent foregoing averments are reiterated as if restated herein.

15. At all times relevant hereto Mrs. Jones resided at the above captioned address and was employed by Defendant City of Warrensville Heights as a police officer, from August 2002 until her termination effective October 20, 2017.

16. Defendant City of Warrensville Heights ("City") is located in Cuyahoga County, Ohio and is a municipal corporation duly organized under the laws of the State of Ohio with its business offices located at the above captioned address.

17. Defendant Bradley D. Sellers was at all time relevant hereto the duly elected Mayor of Warrensville Heights.

18. Defendant Wesley Haynes was at all times relevant hereto employed as the Chief of Police of Warrenesville Heights.

19. On July 6, 2016 Mrs. Jones, while off-duty and at home posted a video on YouTube in which she gave an impassioned commentary and opinion on the state of affairs in the United States regarding the interaction between the police and the public. Mrs. Jones was moved to exercise her First Amendment right to free speech after two high-profile police involved shootings of African American males; one in Louisiana and one in Minnesota.

20. Mrs. Jones commentary on YouTube was constitutionally protected speech. It was on a matter of public concern, and in her role as a police officer she was uniquely qualified to comment on this matter.

21. At the time, the City did not have a social media policy.

22. On the day she posted the YouTube video Mrs. Jones was called into a meeting with the Chief of Police, Mayor Brad Sellers and Chief of Staff Kellie Wilson. The Chief of Police sent a coworker, Detective Curry, to pick her up from her home and to take her to the police department. He told her that some coworkers were upset with the comments she made on Facebook and that they did not want to work with her. In the meeting, the Mayor's chief of staff told Mrs. Jones she should retain an attorney. I was not permitted to work my next scheduled shift because the Chief was fearful for her safety. The Chief also informed her she would be assigned to the dispatch office upon her return to work.

23. Mrs. Jones was subsequently invited by ABC News to sit on a panel with President Barack Obama in which issues related to, among other things, the matters of public concern she raised in her Facebook post were to be discussed. The Mayor gave her permission to attend and to wear her police uniform. She attended and participated in the panel discussion.

24. When certain coworkers saw her on television on the panel they became irate.

4

25. Certain coworkers would call off so they would not have to work with her. Others refused to speak to her.

26. She was told by a supervisor that coworkers complained to him about comments other coworkers were making about her. He took the complaints to the Chief.

27. She received hate mail in her mailbox at work. A post card, which was determined to be from someone within the Police Department, accused her of being responsible for the deaths of police officers in a shooting in Dallas, Texas. She also was informed that a coworker stated "she needs a bullet in the back of her head".

28. This conduct caused her to send a written memo to the Chief about the post card and manner in which she was being retreated at work because she feared for her safety at work. She was fearful that her coworkers would not back her up in the line of duty.

29. After she sent the memo, the Chief, the Mayor and his Chief of Staff Kellie Wilson met with her. She explained how she was being treated in the workplace. The Mayor asked her a series of questions and then informed her that the alleged killer of the police officers in the recent Dallas shootings thanked her in a letter he had written before the shooting.

30. The Mayor and Chief then scheduled a meeting of the entire Police Department to discuss Mrs. Jones Facebook post and provided supervisors and coworkers an open forum to denigrate Mrs. Jones. The Mayor and Chief permitted her coworkers to openly ridicule her for her Facebook post. In the meeting she was ridiculed by the Mayor. Lt. Kerling went on a tirade and called her a disgrace to the Department, stated she had no integrity, he did not like her and he was embarrassed to work for Warrensville Heights. The Mayor told her coworkers that he met with his legal team and they "tried to get her". The Mayor

5

did acknowledge that the post card came from within the Police Department. The Mayor also announced that there would be a social media policy enacted.

31. The conduct of the Mayor, the Chief and certain supervisors and coworkers at the meeting was malicious, outrageous, unwelcome, unprofessional, retaliatory and was calculated to cause and did Mrs. Jones extreme emotional distress.

32. Upon information and belief, United States Congresswoman Marcia Fudge, 11th District of Ohio, contacted the Mayor and related that nothing should be done to Mrs. Jones on account of her Facebook post.

33. After the meeting she became even more fearful for her safety at work.

34. On May 28, 2017 Mrs. Jones was in an automobile accident in the line of duty. She was diagnosed with a shoulder injury, a concussion and post-concussion syndrome. She was treated and returned to work. She filed a workers compensation claim and was receiving medical treatment.

35. On or about August 29, 2017 she was treated by a neurologist who informed the Department she would be off duty for medical reasons until November 1, 2017 provided she did not need further treatment due short term memory issues arising out of the injuries she incurred in the motor vehicle accident.

36. On September 29, 2017 the City required her to undergo a separate independent medical evaluation conducted by a medical professional of the City's choosing, which evaluation was not conducted by a neurologist. Upon information and belief, the medical professional who conducted the independent medical evaluation, without the benefit of reviewing Mrs. Jones' treatment record, formed an opinion that she was fit for duty. The

City offered her to return to work on October 9, 2017, contrary to the medical opinion of her treating neurologist.

37. Mrs. Jones' medical condition did not preclude her from engaging in all activities of daily life, however, due to her short term memory issues arising out of the motor vehicle accident, her treating neurologist formed an opinion that she could not perform the duties of a police officer until she successfully completed an ongoing course of treatment, including speech therapy as a means to treat her short term memory loss issues. Her neurologist encouraged her to engage in public speaking engagements as a means to augment her therapy.

38. At the public speaking engagements she attended, she continued to engage in speech on matters of public concern related to the comments she made on her Facebook post.

39. Mrs. Jones was concerned about her being ordered back to work by the City which was contrary to the tentative return to work date provided by her treating neurologist. Rather than return to work on October 13, 14 and 15, 2017, the next days she was scheduled to work after October 9, 2017, she contacted the Police Department and to inform her chain of command that she would be utilizing sick leave for her next scheduled work days as she was under the care of her neurologist who had written her off work for medical, neurological issues until at least November 1, 2017.

40. On October 13, 2017, her next scheduled work day after she was ordered to return to work, she flew to Philadelphia, Pennsylvania to attend a public speaking engagement.

41. The City became aware of Mrs. Jones speaking engagement and her use of sick leave. On October 16, 2017 the City issued her a pre-disciplinary notice accusing her of

fraudulent/deceptive use of paid leave in violation of various City policies and the oath of office she swore as a police officer.

42. The City held a pre-disciplinary meeting with her and her union representative on October 18, 2017.

43. On October 20, 2017 terminated Mrs. Jones for fraudulent/deceptive use of sick leave for allegedly calling off work for October 13, 14 and 15, 2017 after previously scheduling the trip to Philadelphia. The termination was further based upon her engagement in other speaking engagements while on leave for treatment of her work-related injuries.

44. The stated basis for her termination was next readily available act that presented the Defendants a basis (a pretextual retaliatory basis) to support a termination, the true reason being her engagement in constitutionally protected speech.

45. Mrs. Jones was subjected to an adverse employment action that would deter a person of ordinary firmness from continuing to engage in speech or conduct of the nature she engaged in on her Facebook post and her continued public speaking engagements on the same matters of public concern.

46. Mrs.  Jones's aforementioned repeated engagement in protected speech on matters of public concern was the motivating factor for the adverse employment action taken by Defendants.

47. The Defendants would not have taken the adverse employment action but for her continuous engagement in constitutionally protected speech.

48. The Defendants, therefore, have violated the first amendment rights of Mrs. Jones.

49. Defendants' have retaliated against Ms. Jones by fostering and condoning malicious, outrageous, unwelcome, unprofessional, retaliatory actions toward Mrs. Jones,

culminating a pretextual termination which was calculated to cause and did Mrs. Jones extreme emotional distress, and have otherwise subjected her to ridicule and scorn within her employment.

50. Similarly situated employees with less seniority in the Police Department and/or who have not been disciplined for engaging in expression and speech protected by the First Amendment have been treated more favorably in the terms and conditions of their employment.

51. Defendants' actions have subjected Mrs. Jones to scorn and ridicule in the community.

52. By reason of the foregoing acts and omissions of Defendants, and in violation of the U.S. Const., Amend. 1 and 14, Mrs. Jones has been deprived of and denied her U.S. Constitutional rights to freedom of expression and speech, proximately resulting in reasonably foreseeable damages, in indeterminate sums to be proven at trial, in terms of: loss of salary and overtime wages, plus value of fringe benefits, to date of trial ("Back Pay") and, potentially, thereafter ("Front Pay"); mental anguish and emotional distress (requiring continual professional care and treatment); humiliation and disparagement of reputation; impairment and diminution of future earning capacity and career prospect; and general loss of enjoyment of life, all warranting an award of general compensation ("Compensatory Damages"); and exemplary or punitive damages ("Punitive Damages"), which ought to be awarded against defendants because of their intentional, malicious, willful, wanton and/or reckless violations of plaintiffs' said Constitutional rights.

### Count II (§1983 Violations)

53. All foregoing relevant, material and pertinent averments are reiterated and incorporated herein by reference.

54. Defendants, and each of them, have taken action and/or have adopted customs, policies, practices, procedures or usages, fostering, promoting and/or condoning (and/or they have failed or refused to adopt or observe appropriate measures preventing) discriminatory disparate employment treatment of and/or impact upon Mrs. Jones on account of her engagement in protected speech and activities (and in retaliation or reprisal for same), all resulting in unconstitutional deprivations and denials of her rights of free speech and expression under the First and Fourteenth Amendments to the U.S. Constitution.

55. Defendants Mayor Sellers' and Chief Haynes' unconstitutional and retaliatory acts, abusive of their power, were committed under color of state law.

56. By reason of the foregoing and the Defendants' violations of §1983, Mrs. Jones has been damaged in said sums of Back Pay and Compensatory and Punitive Damages.

### Count III (Ohio Civil Rights Act Violations)

57. All foregoing relevant, material and pertinent averments are reiterated and incorporated herein by reference.

58. Defendant City of Warrensville Heights was and is an employer within the meaning of the Ohio Civil Rights Act ("OCRA"), Chapter 4112, Ohio Revised Code ("R.C."), and specifically R.C. 4112.01(A)(2) of the OCRA.

59. Defendant engaged in patterns or practices of employment discrimination and retaliation, all in violation of O.R.C. 4112.02(A) and R.C. 4112.02(I) of the OCRA, and the

provisions of the Ohio Administrative Code ("OAC") promulgated thereunder against Plaintiff.

60. Defendant's actions constitute continuing and ongoing gender based discrimination and retaliation for Mrs. Jones having engaged in activity protected under R.C. 4112.02(I).

61. The discriminatory and retaliatory practices of Defendant fostered and condoned a gender based and retaliation based hostile work environment.

62. Defendant Bradley D. Sellers is the duly elected Mayor of Warrensville Heights, Ohio.

63. Mrs. Jones was employed as a police officer in the Warrensville Police Department of the City from August 2002 until her wrongful termination effective October 20, 2017.

64. Mrs. Jones was the first African American female hired as a police officer by the City and was the only female employed by the Warrensville Heights Police Department for at least the last six years of her employment.

65. From the time she was hired through the date of her termination, the City engaged in a pattern and practice of disparate treatment on account of her gender, race and on account of complaints of gender based disparate treatment in the workplace, including, but not limited to, duty assignments, derogatory comments about her being pregnant and refusal to accommodate her request for separate changing and restroom facilities for female officers, leaving her the option to use the same facilities as her male coworkers or to use a public restroom in the building. Mrs. Jones endured offensive, unwelcome and gendered comments from male coworkers and supervisors including, referring to her latest pregnancy in 2013, "I can't believe that bitch is pregnant again" and "doesn't she know how to use a condom". A sign was placed on the door of the only locker room that could be turned around to indicate if a male or female was using it. Certain male employees

would leave the male sign on the door in order to harass Mrs. Jones. In August 2017 a coworker stated, in response to an announcement that a test for prospective officers was being offers, "I hope we don't hire any more females because they're useless".

66. This was not the first time she was subjected to unwelcome and offensive gender based comments in the workplace. During each of her two prior pregnancies she was subjected to such conduct in the workplace.

67. Mrs. Jones repeatedly complained during the course of her employment about the lack of separate facilities for a female officer to change, but was regularly informed by the City that the building was "grandfathered in" and there was nothing that could be done to afford her separate facilities.

68. Mrs. Jones repeatedly complained about the disparate manner in which she, as a female, was treated and the offensive gendered comments made in the workplace by her coworkers and supervisors. Despite her complaints the disparate treatment persisted.

69. The unwelcome and offensive gender based commentary and gender based disparate treatment she was subjected to which was fostered and condoned by Defendants created a gender based hostile work environment.

70. On July 6, 2016 Mrs. Jones, while off-duty and at home posted a video on YouTube in which she gave an impassioned commentary and opinion on the state of affairs in the United States regarding the interaction between the police and the public. Mrs. Jones was moved to exercise her First Amendment right to free speech after two high-profile police involved shootings of African American males; one in Louisiana and one in Minnesota.

71. Mrs. Jones commentary on YouTube was constitutionally protected speech. It was on a matter of public concern, and in her role as a police officer she was uniquely qualified to comment on this matter.

72. At the time, the City did not have a social media policy.

73. On the day she posted the YouTube video Mrs. Jones was called into a meeting with the Chief of Police, Mayor Brad Sellers and Chief of Staff Kellie Wilson. The Chief of Police sent a coworker, Detective Curry, to pick her up from her home and to take her to the police department. He told her that some coworkers were upset with the comments she made on Facebook and that they did not want to work with her. In the meeting, the Mayor's chief of staff told Mrs. Jones she should retain an attorney. I was not permitted to work my next scheduled shift because the Chief was fearful for her safety. The Chief also informed her she would be assigned to the dispatch office upon her return to work.

74. Certain coworkers would call off so they would not have to work with her. Others refused to speak to her.

75. She was told by a supervisor that coworkers complained to him about comments other coworkers were making about her. He took the complaints to the Chief.

76. She received hate mail in her mailbox at work. A post card, which was determined to be from someone within the Police Department, accused her of being responsible for the deaths of police officers in a shooting in Dallas, Texas. She also was informed that a coworker stated "she needs a bullet in the back of her head".

77. This conduct caused her to send a written memo to the Chief about the post card and manner in which she was being retreated at work because she feared for her safety at work. She was fearful that her coworkers would not back her up in the line of duty.

13

78. After she sent the memo, the Chief, the Mayor and his Chief of Staff Kellie Wilson met with her. She explained how she was being treated in the workplace. The Mayor asked her a series of questions and then informed her that the alleged killer of the police officers in the recent Dallas shootings thanked her in a letter he had written before the shooting.

79. The Mayor and Chief then scheduled a meeting of the entire Police Department to discuss Mrs. Jones Facebook post and provided supervisors and coworkers an open forum to denigrate Mrs. Jones. The Mayor and Chief permitted her coworkers to openly ridicule her for her Facebook post. In the meeting she was ridiculed by the Mayor. Lt. Kerling went on a tirade and called her a disgrace to the Department, stated she had no integrity, he did not like her and he was embarrassed to work for Warrensville Heights. The Mayor told her coworkers that he met with his legal team and they "tried to get her". The Mayor did acknowledge that the post card came from within the Police Department. The Mayor also announced that there would be a social media policy enacted.

80. The conduct of the Mayor, the Chief and certain supervisors and coworkers at the meeting was malicious, outrageous, unwelcome, unprofessional and was calculated to cause and did Mrs. Jones extreme emotional distress.

81. Upon information and belief, United States Congresswoman Marcia Fudge, 11th District of Ohio, contacted the Mayor and related that nothing should be done to Mrs. Jones on account of her Facebook post.

82. After the meeting she became even more fearful for her safety at work.

83. On May 28, 2017 Mrs. Jones was in an automobile accident in the line of duty. She was diagnosed with a shoulder injury, a concussion and post-concussion syndrome. She was

treated and returned to work. She filed a workers compensation claim and was receiving medical treatment.

84. On or about August 29, 2017 she was treated by a neurologist who informed the Department she would be off duty for medical reasons until November 1, 2017 provided she did not need further treatment due short term memory issues arising out of the injuries she incurred in the motor vehicle accident.

85. On September 29, 2017 the City required her to undergo a separate independent medical evaluation conducted by a medical professional of the City's choosing, which evaluation was not conducted by a neurologist. Upon information and belief, the medical professional who conducted the independent medical evaluation, without the benefit of reviewing Mrs. Jones' treatment record formed an opinion that she was fit for duty. The City offered her to return to work on October 9, 2017, contrary to the medical opinion of her treating neurologist.

86. Mrs. Jones' medical condition did not preclude her from engaging in all activities of daily life, however, due to her short term memory issues arising out of the motor vehicle accident, her treating neurologist formed an opinion that she could not perform the duties of a police officer until she successfully completed an ongoing course of treatment, including speech therapy as a means to treat her short term memory loss issues. Her neurologist encouraged her to engage in public speaking engagements as a means to augment her therapy.

87. During the time she was off due to the medical condition arising out of the motor vehicle accident, she did attend speaking engagements and was encouraged to engage in such events by her treating neurologist as a means to augment her speech therapy.

88. Mrs. Jones was concerned about her being ordered back to work by the City which was contrary to the tentative return to work date provided by her treating neurologist. Rather than return to work on October 13, 14 and 15, 2017, the next days she was scheduled to work after October 9, 2017, she contacted the Police Department and to inform her chain of command that she would be utilizing sick leave for her next scheduled work days as she was under the care of her neurologist who had written her off work for medical, neurological issues until at least November 1, 2017.

89. On October 13, 2017, her next scheduled work day after she was ordered to return to work, she flew to Philadelphia, Pennsylvania to attend a public speaking engagement.

90. The City became aware of Mrs. Jones speaking engagement and her use of sick leave. On October 16, 2017 the City issued her a pre-disciplinary notice accusing her of fraudulent/deceptive use of paid leave in violation of various City policies and the oath of office she swore as a police officer.

91. The City held a pre-disciplinary meeting with her and her union representative on October 18, 2017.

92. On October 20, 2017 terminated Mrs. Jones for fraudulent/deceptive use of sick leave for allegedly calling off work for October 13, 14 and 15, 2017 after previously scheduling the trip to Philadelphia. The termination was further based upon her engagement in other speaking engagements while on leave for treatment of her work-related injuries.

93. The stated basis was pretextual, the true reason being retaliation for her repeated engagement in protected activity in the form of complaints of gender based disparate treatment in the workplace.

94. By reason of the foregoing acts and omissions discrimination by Defendants on account of her gender which fostered and condoned a gender based hostile work environment in violation of O.R.C. §4112.02(A) and ultimately a pretextual, retaliatory discharge of Mrs. Jones on account of her engagement in activity protected the OCRA and OAC, in particular O.R.C. §4112.02(I), Mrs. Jones has suffered damages in indeterminate sums to be proven at trial in terms of: loss of salary or wages plus value of fringe benefits to date of trial ("Back Pay") and thereafter ("Front Pay"); mental anguish and emotional distress, humiliation and disparagement of reputation, and general loss of enjoyment of life, all warranting further or general compensation ("Compensatory Damages"); and punitive or exemplary damages ("Punitive Damages"), which ought to be awarded by reason of the deliberate, intentional, willful, wanton, malicious and/or reckless violations of the OCRA and OAC by the Defendant.

**Count IV (Intentional Infliction of Emotional Distress)**

95. All relevant, material and pertinent foregoing averments are reiterated.

96. By their actions as described above, Defendants intentionally and maliciously, with reckless disregard for the consequences of their actions acted in a manner which they knew or should have known would cause great emotional suffering to Mrs. Jones, thus committing the tort of intentional infliction of emotional distress by extreme and outrageous conduct, to the great detriment and loss of Mrs. Jones.

97. By reason of the foregoing acts of intentional infliction of emotional distress, Mrs. Jones has suffered damages in indeterminate sums to be proven at trial in terms of: loss of mental anguish and emotional distress, humiliation and disparagement of reputation, and general loss of enjoyment of life, all warranting further or general compensation ("Compensatory Damages"); and punitive or exemplary damages ("Punitive Damages"),

which ought to be awarded by reason of the deliberate, intentional, willful, wanton, malicious and/or reckless acts and omissions of Defendants.

WHEREFORE, Mrs. Jones demands:

A.  Trial by jury, pursuant to Fed. R. Civ. P. 38 and U.S. Const., Amend. 7, on all issues of law;

B.  Judgment against Defendants for equitable relief and redress, including declaratory judgments and preliminary and permanent injunctive relief, both prohibitory and mandatory;

C.  As to Counts I and II judgment for Mrs. Jones, in accordance with each Count hereof, for said sums of Back and Pay, plus prejudgment interests and costs, as well as reasonable attorneys' and expert witness' fees and expenses under the Civil Rights Attorneys Fees Award Act of 1976, as amended, 42 U.S.C. §1988;

D.  As to Counts III and IV judgment for Plaintiff and against Defendant City of Warrensville Heights for an for said sums of Back and Front Pay and Compensatory and Punitive Damages, plus an award of reasonable attorneys' fees on any Punitive Damages award; and/or

E.  Such other and further relief and redress as is just and equitable under the circumstances.

Respectfully submitted,

s/ John F. Myers
John F. Myers (#0032779)
275 North Portage Path #3C
Akron, Ohio 44303
330-535-0850
330-819-3695
johnmyerscolpa@gmail.com
Attorney for Plaintiff Nakia Jones

18