UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| NAKIA L. JONES, | ) | CASE NO.:  1:18-CV-00647 |
| | ) | |
| Plaintiff, | ) | JUDGE:  PATRICIA A. GAUGHAN |
| | ) | |
| vs. | ) | **PLAINTIFFS' OPPOSITION TO** |
| | ) | **DEFENDANTS' MOTION FOR** |
| CITY OF WARRENSVILLE HEIGHTS, et al., | ) | **SUMMARY JUDGMENT** |
| | ) | |
| | ) | |
| Defendants | ) | |

Now comes Plaintiff, Nakia L. Jones, by and through undersigned counsel, and for her opposition to Defendants' Motion for Summary Judgment states that for the reasons set forth in the attached memorandum in support there are genuine issues of material fact that preclude the grant of summary judgment as a matter of law.

Respectfully submitted,

s/ John F. Myers
John F. Myers (0032779)
275 North Portage Path #3C
Akron, Ohio 44303
330-819-3695
330-535-0850
johnmyerscolpa@gmail.com
Attorney for Plaintiff Nakia L. Jones

i

## Table of Contents

I.      Introduction…………………………………………………………………………1

II.     Statement of Facts……………………………………………………………..…1

        A. Sex based hostile work environment……………………………………………..1

        B. Ms. Jones' exercise of her First amendment rights is a motivation factor in
         her termination………………………………………………………………………5

III.    Law and Argument…………………………………………………………………,17

        A. Mrs. Jones has stated a prima facie case of First Amendment Retaliation
        and her engagement in constitutionally protected speech and conduct was the
        motivating factor in the decision to terminate her employment………………………17

        B. Mayor Sellers and Chief Haynes are not entitled to Qualified Immunity…………21

        C. Mrs. Jones was subjected to a sex based hostile work environment……………….22

        D. Mrs. Jones has stated a claim for intentional infliction of emotional distress……..24

IV.     Conclusion……………………………………………………………………..26.

## Table of Authorities

**Cases**

*Anderson v. Creighton*, 483 U.S. 635, 640 (1987)………………………………………...21

*Bloch* v. Ribar 156 F.3d  673 (1998)……………………………………………….…20

*Dye v. Office of the Racing Comm'n*, 702 F.3d 286, 303 (6th Cir. 2012)…………………17

*Clark v. United Parcel Service, Inc.*, 400 F.3d 341 (Cir. 2005)…………………………..22, 23

*Ctr. for Bio-Ethical Reform, Inc. v. City of Springboro*, 477 F.3d 807, 822 (6th Cir. 2007)…17

*Ehrlich v. Kovack*, 710 Fed.Appx. 646 (6th Cir. 2017)……………………………………17, 18

*Faragher v. City of Boca Raton*, 118 S.Ct. 2275, 2283 (1998)………………………………23

*Greene v. Barber*, 310 F.3d 889, 897 (6th Cir.2002)………………………………………20

*Graham v. Connor,* 490 U.S. 386, 394 (1989)……………………………………………...21

*Hampel v. Food Ingredients Specialties, Inc.* (2000) 89 Ohio St.3d 169(2000)………….. 23

*Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982)……………………………………………21

*Harris v. Forklift Systems, Inc.,* 510 U.S. 17 (1993) ……………………………………….23

*Holzemer v. City of Memphis*, 621 F.3d 512, 526, (Cir. 2010)…………………………18, 20

*Hope v. Pelzer* 536 U.S. 730 (2002)………………………………………………...22

*Malley* v.*. Briggs*, 475 U.S. 335, 341 (1986)……………………………………………...21

*Meyers v. City of Cincinnati*, 979 F.2d 1154, 1155 (6th Cir. 1992)…………………………22

*Oncale v. Sundowner Offshore Servs., Inc.*, 118 S.Ct. 998, 1003 (1998)……………………23

*Pyle v. Pyle*, 11 Ohio App.3d 31, 34 (Ohio App. 8 Dist. 1983)……………………………..25

*Rodgers v. Banks*, 344 F.3d 587, 602 (6th Cir. 2003)………………………………………18

*Saucier v. Katz*, 533 U.S. 194 (2001)' abrogated in part by *Pearson v. Callahan*, 555 U.S. 223, 236 (2009) …………………………………………………………..21, 22

*Scarbrough v. Morgan Cty. Bd. of Educ.*, 470 F.3d 250, 255 (6th Cir. 2006)…………….....17

*Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999)…………………………………..17

*University of Texas Medical Center v. Nassar*,. 133 S.Ct. 2517 (2013)……………………18

*Wallner v. Hilliard*, 590 Fed.Appx. 546, 556 (6th Cir. 2014)………………………………18

## Constitutional Amendments, Statutes

U.S. Constitution, First Amendment ………………………………………..5, 17, 18, 19, 22

42 U.S.C. § 1983……………………………………………………………………17, 21

Restatement of Torts 2d 73, Section 46, comment d…………………………………………25

Restatement of Torts 2d 77, Section 46, comment j…………………………………………..25

**Memorandum In Support of Opposition to Defendants' Motion for Summary Judgment**

## I.      Introduction

Plaintiff Nakia L. Jones's claims arise out of her termination from her position as a patrol officer with the City of Warrensville Heights. Ms. Jones contends that her termination was substantially motivated by her constitutionally protected speech in the form of a Facebook post in which she commented on a police shooting of an African American man and the state of affairs in the United States between the police and the public, as well as subsequent speaking engagements in which she spoke on similar topics.Doc#12, PageID#4, 6, 8 (Complaint ¶¶19, 38, 46). She also contends that during the course of her fifteen year employment with the City she was subjected a sex based hostile work environment, that she was terminated in retaliation for having complained about the sex based acts that created the hostile work environment and that she was subjected to intentional infliction of emotional distress in the workplace.

## II.     Statement of Facts

Mrs. Jones was employed by the City of Warrensville Heights as a police officer from August 2002 until she was terminated on October 20, 2017. Nakia Jones Deposition ("Jones Depo") 17; Doc1, PageID2 (Complaint ¶2). When she was hired there was one other female police officer; no other women were hired as police officers during the time she was employed. Jones Dep 21. For a period of time she was the only female officer. Chief Wesley Haynes Deposition (Haynes Dep 59.

### A. Sex based hostile work environment.

From the beginning of her employment she was subjected to sex based comments. As part of the hiring process she was required to take a polygraph examination in which she was asked sexually explicit questions. Jones Dep 21-23, 80. She became aware that someone had

discussed her responses to the questions with her coworkers as were discussing her responses. Jones Dep 26. She complained and the conduct stopped. Jones Dep 26.

Certain lieutenants were "extremely disrespectful and treated her differently than others in the police department. Jones Dep 26, 30-.33 During one of Mrs. Jones pregnancies, Lt. Curtain required her to perform jail checks during one of her pregnancies; he had not required her female coworker to perform such jail checks when she was pregnant due to safety concerns. Jones Dep 28-29, 32. Lt. Kerling was condescending and disrespectful to women. Jones Dep 34.-35. It got the point that Ms. Jones complained to Kelli Jones, Mayor Seller's Chief of Staff. Jones Dep. She told Ms. Wilson that Lt. Kerling would not address complaints she raised, that he was disrespectful to her, that he always had an issue with her. Jones Dep 36. Ms. Wilson said that she would have to tell the Mayor about Lt. Kerling, and apparently she did, but the conduct of Lt. Kerling toward her got worse. Jones Dep. 37.

She also complained to Ms. Wilson about the locker room that the male and females officers had to share. Jones Dep 36. Ms. Jones had previously complained about the sole men's locker room facility and the solution reached was to put a sign on the door that she could flip to "Women" while she was in the locker room, so her male coworkers would not enter; she had to use the public restroom while the men had a restroom in the locker room for their use. Jones Dep 39-44. Male coworkers would flip the sign back to "Men" when she would go in the locker room. Jones Dep 92-93. Ms. Jones' coworkers pushed the door open while she was in the locker room changing clothes. Jones Dep 46. Ms. Jones never used the locker room to change again. Jones Dep 47. Ms. Wilson told Ms. Jones that the locker room issue could not be resolved by adding a facility for female officers. Jones Dep 45.

Ms. Jones would complain to her sergeants that the male officers on prior shifts would leave that car she was assigned a mess or leave magazines open to racy photographs. Jones Dep 49-52. At one point Lt. Curtain told her she would have to keep her car clean or he would have to write her; she sent him a memo that she was going to report the situation to Chief Haynes. Jones Dep 51-52. He met with her and she told him about the condition her male coworkers left the cars. Jones Dep 52. Lt. Curtain was agitated, but said he would speak to her sergeants. Jones Dep 52. Two weeks later she found a pocket knife under the seat of her assigned car. Jones Dep 53. She turned it in to her sergeant who told her it was Lt. Curtain's knife; this upset her. Jones Dep 53.

Lt. Kerling had derogatory caricatures of officers, including Ms. Jones, posted on the bulletin board in his office. Jones Dep 54-59. She did complain to "the guys", some of whom thought it was funny and some did not. Jones Dep. 55. The caricatures would be changed over time, but the drawings were generally of coworkers who Lt. Kerling or others did not like. Jones Dep 57-58. Ms. Jones did not complain to the Lt. Kerling or Chief Haynes.

Ms. Jones gave birth to three children while employed at Warrensville Heights. Jones Dep 10-11. During one her pregnancies, when Detective Sergeant Senft found out he stated "doesn't she know how to use condoms". Jones Dep 59. A coworker told her and she complained to her sergeant. Jones Dep 60. Her sergeant asked if she wanted to make a formal complaint and if she just wanted him to have a talk with him; she opted to have him speak with him. Jones Dep 60. During two of her pregnancies Lt. Kerling, intentionally according to Ms. Jones, rotated her light duty shifts between days and nights. Jones Dep 61-64. Her doctor sent in a note regarding her pregnancy and the need to have a consistent schedule. Jones Dep 61-62. He continued to adjust her schedule despite her pleading that due to her pregnancy she was not sleeping well and

3

was sick. Jones Dep 62It took a second letter from her doctor before Lt. Kerling assigned her to a consistent schedule. Jones Dep 61. On another occasion during her last pregnancy, she responded to a calls and one of her sergeants pepper sprayed a suspect and wrestled him to the ground. Jones Dep 66-68. He then threw the suspect, bloody and smelling of pepper spray, in the back seat of her cruiser, even though his cruiser was on the scene. Jones Dep 67. She complained to him but he insisted she transport the suspect. Jones Dep 66.

She contends that the manner in which she was treated was on account of her gender, as her male coworkers were treated differently. Jones Dep 69. She elaborated on other examples. A coworker, Officer Videc was perpetually late to his shift and Mrs. Jones would have to wait until he arrived until she could go home and nothing happened to him. Jones Dep 70-71. On most of her shifts from 2014-2015, ninety percent of the time she was placed in dispatch, even though she was the senior officer on shift and should have been assigned to the road, because she was a woman. Jones Dep 71-72, 74. On many occasions, even if she objected she would still be assigned to dispatch. Jones Dep 76. Dispatch was more stressful than working road patrol. Jones Dep 76.

In 2014 and 2015 she was the only officer doing domestic violence arrests and reports. Jones Dep 73. She complained to her sergeant because her male coworkers did not want to arrest the male perpetrators. Jones Dep 78. She would protest that the woman could not be left in the situation. Jones Dep 78-79. He male coworkers also pushed the report off on her, even though she was not the officer assigned to the area where the incident occurred. Jones Dep 78. Lt. Curtin did speak to her fellow officers about the situation, but there was no appreciable change. Jones Dep 79.

Manpower in the department is low, so when a day off becomes available, everyone tries to get it. Jones Dep 81. The schedule was supposed to be published, but her male coworkers, sergeants and officers, would speak among themselves and decide who would get the day off. Jones Dep 82-84. Despite her addressing the issue with her sergeant, the situation never changed. Jones Dep 85.

Ms. Jones also contends that her male coworkers single her out and make her feel different as the person with an attendance problem when certain men have taken as much time off as she has. Jones Dep 85-86. She has a chronic medical condition, Lupus, and had three children while working for the police department. Jones Dep 86.

In August of 2016 during roll call for a shift someone asked if there were any women who passed the civil service test for the police department. Jones Dep 93. A male coworker stated that he the department would not hire anymore females because they are useless. Jones Dep 93. The next day he approached her and said he hoped she was not offended; he was not talking about her. Jones Dep 93-94.

Ms. Jones was faced with a dilemma when it came to complaints about how she was treated in the workplace. When she complained, things would get worse and her supervisors would not take her seriously. Jones Dep 49. If she did something it was amplified or blown out of proportion; she had no room for error even though male coworkers engaged in worse conduct. Jones Dep 87-89.

**B. Ms. Jones' exercise of her first amendment rights is a motivation factor in her termination.**

On July 6, 2016 Ms. Jones son woke her up and asked if she had seen news of the Alton Sterling shooting. Jones Dep 111. She and her son watched the video of the shooting on Facebook. Jones Dep 111. He told her it terrified him and that he is afraid of people who wear

5

the police uniform. Jones Dep 112. Her son's reaction to the Alton Sterling shooting moved her to post her commentary on YouTube, thinking it would only be available to her friends who had access to her private Facebook page. Jones Dep 112-113. Much to her surprise someone reposted the video and it went viral. Jones Dep 114-115. She was scared because she had never been in the spotlight in such a manner before. Jones Dep 115. The next morning she received a call from the dispatcher at the Warrensville Heights Police Department who informed her that the news media was in the parking lot of city hall and that the phones were "blowing up". Jones Dep 116. Later that day she received a call from the police department and was told Chief Haynes wanted to meet with her. Jones Dep 117. Detective Curry came to pick her up and she proceeded to the police department. Jones Dep 117-118. Detective Curry told her a lot of the guys were upset and some expressed that they did not want to work with her. Jones Dep 118. Mayor Sellers and Chief Haynes were also aware that certain of his subordinates were upset at the Facebook post. Sellers Dep 21-22; Haynes Dep 18.

Chief Haynes wanted to discipline Mrs. Jones for her Facebook post. Wilson Dep 62-63. However Mayor Sellers determined that she should not be disciplined. Wilson Dep 62, 64. .

She met with Chief Haynes and Kelli Wilson (Mayor Sellers' Chief of Staff); Mayor Sellers participated by phone as he was out of town. Jones Dep 119-122. Chief Haynes asked her to explain the situation. Jones Dep 120. Ms. Wilson advised that Ms. Jones may want to retain an attorney. Jones Dep 120, 121. Mayor Sellers told her that since she made the mess she has to clean it up; he said you have involved us all in your own mess. Jones Dep 121; Haynes Dep 20-22. At the meeting it was decided that she be taken off the road and work dispatch for her own safety. Jones Dep 121, 123. She expressed concern that some of her fellow officers did not want to work with her; Chief Haynes said he would handle it. Jones Dep 130. She returned to work on

6

July 8, 2016. Jones Dep 132. She spoke with many of her coworkers to explain her reasoning for posting the video. Jones Dep 133. On her first day Sergeant Senft kept walking by the dispatch office looking her but would not say anything; she complained to Sergeant Turner who went to speak to him. Jones Dep 134-135. Sergeant Senft walked past dispatch again and went downstairs and within a minute or two took a call from a woman who stated "you bitch. My husband is a cop. You fucking bitch. You racist bitch. You need to be fired". Jones Dep 136-137. Mrs. Jones did not know how the woman would have known she would answer the phone, but suspected Sergeant Senft. Jones Dep 137. A few days later she was told that a coworker called off because he did not want to work with her. Jones Dep 138. She was treated like an outcast in the department. Jones Dep 139.

On her first day back she received an anonymous typewritten derogatory letter which contained racist comments and that she was a traitor. Jones Dep 139. She suspected that it come from within the department because it was written on a typewriter and the typeface looked like the product of one of the department typewriters. Jones Dep 140; Haynes Dep 30, 35; Plaintiff' Dep Ex 3. She told Sergeant Johnson who investigated, but could not determine if it was from the department or not. Jones Dep 141. She also received a handwritten note in her mailbox at work on which was written "Bitch, you need a bullet to the back of your head; she put it in the shredder. Jones Dep 141. She did not say anything right away because she thought certain coworkers were trying to get to her. Jones Dep 143. On her next scheduled day of work she received a post card in her mailbox which stated in part that she was responsible for the death of police officers in the shooting in Dallas.[1] Jones Dep 143-144; Haynes Dep 30-31; Plaintiff Dep Ex 2. Mrs. Jones concluded, after speaking with a U.S. Postal Service employee that the post

---

[1] Five police officers were killed in a shooting in Dallas, Texas on July 7 ,2016. See, https://www.nytimes.com/2016/07/09/us/dallas-police-shooting.html.

card had not been mailed. Jones Dep 143-145. She complained to her union representative who advised her to write a memo to Chief Haynes. Jones Dep 146.

On July 27, 2016 she sent a memo to Chief Haynes expressing safety concerns arising out the writings she received and her concerns that her fellow officers do not want to work with her or back her up while on duty. Jones Dep 146; Jones Dep Ex G. This prompted Chief Haynes to set up a meeting with Mrs. Jones, Ms. Wilson and Mayor Sellers. Jones Dep 147; Haynes Dep 28-28. Mrs. Jones gave Chief Haynes the postcard and type written letter she had received. Haynes Dep 30; Plaintiff Depo Ex 2, 3. Mayor Sellers told her that the shooter in Dallas thanked her in his manifesto and she responded that that was what was said in the postcard she received. Sellers Dep 26; Jones Dep 147; Haynes Dep 34. Mrs. Jones was unaware she had been mentioned by the Dallas shooter. Haynes Dep 41-42. Mayor Sellers' statement led her to conclude that the Mayor told someone in the department because she did not know anything about the Dallas shooter's manifesto. Jones Dep 148. Unbeknownst to Mrs. Jones, Chief Haynes had received a call from the FBI advising him that Mrs. Jones name was mentioned in the Dallas shooter's manifesto; the FBI provided him a copy of the manifesto which he showed to Mayor Sellers. Haynes Dep 32-34; Declaration of Counsel at ¶4 and Exhibit A, pages Bates Nos. 006-012, attached thereto. Chief Haynes never told Mrs. Jones about his conversation with the FBI. Haynes Dep 33-34. Mayor Sellers told Mrs. Jones he was going to set up a round table meeting with all officers in the department so that to address her safety concerns. Jones Dep 150. The meeting was scheduled for August 8, 2016. Jones Dep 151; Jones Dep Ex H.

The roundtable meeting was held on August 8, 2016 in Warrensville Heights Council Chambers. Jones Dep 151-157; See recording manually filed and referenced in Plaintiff's Declaration filed with this brief, which also includes Plaintiff's transcript of the meeting

8

identifying the speakers and their comment.(a full audio recording of the August 8, 2018 meeting). The meeting focused on her coworkers concerns with her and was volatile at times.

Mrs. Jones and three or four coworkers sat on the left side and the remainder of the officers, sergeants and lieutenants sat on the right side. Jones Dep 152. Mayor Sellers told everyone that this was their opportunity to talk about the situation and there would be no repercussions resulting from any comments made. Jones Dep 151. He said everyone needs to say something because Chief Haynes had reported to him that there was a lot of "hoopla" going on. Jones Dep 153. He mentioned specific people who needed to voice their opinion. Jones Dep 153. At one point Chief Haynes stated that the person or persons who wrote any correspondence to Mrs. Jones should come forward to him and admit what they had done and there would be no discipline. Sellers Dep 30-31. There was a discussion of Mrs. Jones trip to Washington D.C. to sit on a panel to discuss bridging the gap between law enforcement and the community. Jones Dep 160-173. Some coworkers were upset that she went to the event in Washington DC and had not received permission; she had received permission from Mayor Sellers. Plaintiff's Declaration at ¶83.

Chief Haynes stated that he has called off sick when he was not in order to take a day off. Haynes Dep 45-46. In the August 8, 2016 roundtable meeting there was much discussion of other officers who used sick leave to take days off when they were not sick. Plaintiff's Declarations ¶¶52, 104, 150, 158. It seems to be a common occurrence in the police department.

Chief Haynes conducted an investigation to determine whether either the postcard (Plaintiff Dep Ex 2) or typewritten letter (Plaintiff Dep Ex 3- postmarked July 8, 2016) )originated in the police department. Haynes Dep 35-40; Sellers Dep 29-30. Chief Haynes sent

Detective Sergeant Clark to the US Post Office to inquire about the letter, but he learned nothing. Haynes Dep 35-37.

After the roundtable meeting, no one came forward to claim that they had prepared the postcard or typewritten letter. Haynes Dep 91-92. At that point Chief Haynes reviewed all personnel records to find signatures with handwriting similar to the signature on the postcard. Haynes Dep 37, 92, 93-94. The only signature he found to be close in form was Mrs. Jones'. Haynes Dep 37. He concluded Mrs. Jones had written the postcard. Haynes Dep 37[2]. He never confronted Mrs. Jones to ask if she prepared the postcard. Haynes Dep 39. According to his deposition testimony Chief Haynes only informed Sergeant Clark, who he directed to take documents from Mrs. Jones' personnel file and the postcard to BCI[3] to see if a handwriting analysis could be done. Haynes Dep 38, 94-95. Again, in his deposition he stated that he had received no written report from BCI, but was informed by Sergeant Clark that "it came back inconclusive. Haynes Dep 95. However, subsequent to his deposition on October 31, 2018 the City produced documents Chief Haynes had received from BCI. Declaration of Counsel, Exhibit A, pages Bates Nos. 002-006, which contradict his deposition testimony.  On August 9, 2016 BCI records indicate that Sergeant Clark submitted a handwriting sample from Mrs. Jones and the postcard ('questioned document') to BCI. Declaration of Counsel, Exhibit A, pages Bates No. 005. On August 11, 2016 BCI sent a memorandum to Lt. Greg Curtin, Warrensville Heights Police Department indicating that the offense being investigated was "fraud" and informing him that no opinion could be offered regarding the documents submitted due to the limited comparable sample and that additional printed sample would be needed for future comparisons. Declaration of Counsel, Exhibit A, pages Bates No. 003. (Apparently Sergeant Clark was not the

---

[2] Chief Haynes did not tell Mayor Sellers about his suspicions until days before his October 31, 2018 deposition. Haynes Dep 38.
[3] BCI is the Ohio Bureau of Criminal Investigation. Haynes Dep 96.

only other person in the police department that Chief Haynes made aware of his suspicion that Mrs. Jones wrote the postcard.) On August 25, 2016 Sergeant Clark submitted additional known writing samples from Mrs. Jones to BCI. Declaration of Counsel, Exhibit A, pages Bates No. 004. On September 7, 2016 BCI sent a memorandum to Sergeant Clark, Warrensville Heights Police Department indicating again that the offense being investigated was "fraud" and informing him that there were insufficient similarities or differences between the writing samples and the "questioned writing" so no opinion could be offered. Declaration of Counsel, Exhibit A, pages Bates No. 002. Chief Haynes does not suspect anyone else of having written the postcard. Haynes Dep 96.

After the meeting it did get a little better with some officers. Jones Dep 159. She could still tell there was friction, but she could work with her coworkers. Jones Dep 159. She did not have any issues performing her job and she was not aware of any officers failing to back her up. Jones Dep 159.

On May 29, 2017 Mrs. Jones was involved in a motor vehicle accident while on duty. Jones Dep 159-160. She suffered a concussion. Jones Dep 173. Between August 8, 2016 and May 29, 2017 she was not subjected to any adverse job actions. Jones Dep 160; Sellers Dep 39.

As a result of the accident Mrs. Jones was off on workers compensation and received accident on duty pay from Warrensville Heights. Jones Dep 178; Wilson Dep 22-23. Mrs. Jones was treated for post-concussive syndrome and suffered from symptoms including bad headaches, stuttering, short term memory issues, difficulty staying on task and problem solving. Jones Dep 177, 180-181, 188. On August 25, 2017 her treating physician originally recommended that she return to work performing light duty on October 16, 2017. Jones Dep 179 181-182; Wilson Dep 73; Plaintiff Dep Ex 1, p Bates No Jones, Nakia 456.  Since Mrs. Jones was scheduled to work

night shift, she asked her treating physician to change her return to work date to November 1, 2017 at which time she would be scheduled for day shift; her physician agreed. Jones Dep 185; Jones Dep Ex L; Wilson Dep 74; Plaintiff Dep Ex 1, p Bates No Jones, Nakia 457. Mrs. Jones had speaking engagements scheduled for Long Island, New York and Philadelphia, Pennsylvania in October 2017. Jones Dep 185-186. She was also undergoing speech therapy. Jones Dep 180-181, 186-188.

Unbeknownst to Mrs. Jones, in late August 2017 the City, through its third party administrator for workers compensation claims concluded that Mrs. Jones should have returned to work and suggested that the City agree to surveille Mrs. Jones and set up an independent medical examination. Sellers Dep  ; Wilson Dep 25, 28, 29, 107-109; Plaintiff Dep Ex 17 (emails between Ms. Wilson and the third party administrator). Mayor Sellers initially disagreed. Wilson Dep 30; Sellers Dep 43. Ms. Wilson subsequently contacted the third party administrator to determine if there was anything else that could be done to get Mrs. Jones back to work. Wilson Dep 30-31. Ms. Buck again stated that the only option was surveillance. Wilson Dep 33-34.

Around this time Chief Haynes approached Ms. Wilson with his concerns that Mrs. Jones was participating in speaking engagements and he wanted to know what was going on. Wilson Dep. 35. Mrs. Jones had participated in a number of events as a private citizen in the April to October 2017 time frame in which she spoke on the issues raised in her Facebook post as well as community and police relations. Plaintiff's Declaration ¶2.a.-g. In fact, Chief Haynes was monitoring her activity while she was on injury leave and once he gathered enough he took it to Ms. Wilson. Haynes Dep 67-68. He mentioned that his subordinates were also complaining about Mrs. Jones' participation in speaking engagements and not working. Wilson Dep 35; Haynes Dep 67. Chief Haynes had never monitored any other employees activities while they

12

were on workers compensation injury leave nor have any of his officers complained about the activities of other officers who were off on workers compensation leave.. Haynes Dep 69-71. Mrs. Jones was the only woman in the department at this time. Haynes Dep 72.

At this point Ms. Wilson, armed with the Chief's complaints, approached Mayor Sellers again and requested surveillance; he agreed this time. Wilson Dep 36. After the first surveillance, it was determined that Mrs. Jones should be sent for an independent medical examination ("IME"), and Mayor Sellers agreed. Wilson Dep 40. The IME was conducted on September 12, 2017. Wilson Dep . It was limited to allowed claims. Wilson Dep 67, 71; Plaintiff's Dep Ex 4 at p3-4 (IME). The IME was based upon medical treatment records through July 14, 2017. Wilson Dep 68-69; Plaintiff's Dep Ex 4, p2. The physician conducting the IME did not review any records of Mrs. Jones medical treatment after July 14, 2017. Wilson Dep 69. The initial surveillance of Mrs. Jones was conducted on September 12-14 and 15, 2017. Wilson Dep 109-110; Plaintiff Dep Ex 18. It just showed day to day activities. Sellers Dep 45-46.

Beginning on September 19, 2017, the third party administrator submitted additional questionnaires to Mrs. Jones treating physician seeking more details about her ability to perform her job duties and when she could return to work. Jones Dep Exs M, N; Wilson Dep 72-80; Plaintiff's Dep Ex 1. On September 19, 2017 the third party administrator asked for information regarding restrictions for Mrs. Jones' release to return to light duty work on 10/16/2017 as long as she shows improvement at the time of her speech therapy. Plaintiff Dep Ex 1, p Bates No. DEFENDANTS 001059. Apparently after an initial round of surveillance on September 12-14, 15, 2017 the City and the third party administrator again sought additional information from Mrs. Jones physician. Plaintiff Dep Ex 1, p Bates No. DEFENDANTS 000933.

13

Armed with an incomplete IME, conflicting questionnaire responses and surveillance footage, Mayor Sellers, Chief Haynes and Ms. Wilson determined the Mrs. Jones should be ordered to return to work. Wilson Dep 42-48. Mayor Sellers relied upon what he was told by Ms. Wilson and Ms. Holland. Sellers Dep 63. The determination was made even though they had access to medical records from Mrs. Jones workers compensation claim which they did not review and even though they had no knowledge what ongoing treatment Mrs. Jones was undergoing as a result of her injuries from the on-duty automobile accident. Wilson Dep 45-47. In fact, records from the City's third party administrator on August 23, 2017 approved ongoing medical treatment for Mrs. Jones to consult with a concussion specialist and an ophthalmologist. Wilson Dep 81; Plaintiff Dep Ex 7. Subsequent records indicated that Mrs. Jones required ongoing medical care and that she was not fit for duty. Wilson Dep 82-92, 101-107; Plaintiff Depo Ex 8 (October 5, 2017 motion to request allowance of claims for concussion and post-concussive syndrome), Ex 11 (October 24, 2017 Physician's Report of Work Ability – off work until 12/31/17), Ex 15 (September 19, 2017 speech therapy referral due to concussion), Ex 16 October 12, 2017 speech therapist report – "Due to the high risk nature and complexity of patient's occupation, it is the professional opinion of this speech pathologist that patient is not yet ready to return to work (see p Bates No. DEFENDANTS 001345).

The City ordered Mrs. Jones to return to work on October 9, 2017. Jones Dep 193; Jones Dep Ex 193. Mrs. Jones understood she could have returned to work on October 16, 2017 if she was assigned light duty, but she was still waiting for her speech therapy to be scheduled. Jones Dep 194. Mrs. Jones called in sick on October 9 and 10, 2017 due to a headache due to her post-concussive syndrome and a Lupus flare up. Jones Dep 197-198. Ms. Wilson informed the Mayor she called in sick; he was within his rights under the collective bargaining agreement to take this

time off because she had sick days available. Sellers Dep 64. She was not scheduled to work on October 11 or 12, 2017. Jones Dep 198; Sellers Dep 66-67.. Mrs. Jones was not aware of the surveillance conducted or the additional requests for information from her doctor. Jones Dep 191. In fact, Mrs. Jones contacted her doctor's office after she was ordered to return to work and was informed that he never changed her return to work date; it remained November 1, 2017. Jones Dep 191-192.

She was next scheduled to work on October 13, 2017, which was also the day she was scheduled to speak at a conference in Philadelphia. Jones Dep 199; Wilson Dep 50-51. Copies of a flier for the event were all over City Hall. Sellers and city workers were talking about it.  Dep 66-67, 69-70. Ms. Wilson spoke to Mayor Sellers about Mrs. Jones' speaking engagement in Philadelphia conflicting with her next scheduled workday and he authorized further surveillance Sellers Dep 68, 69-70; Wilson Dep 50. Mayor Sellers was concerned because once an employee is absent for 3 days in a row they need a medical excuse. Sellers Dep 65.

On October 12, 2017 Mrs. Jones went shopping and then went to the Ahuja Medical Center to get pain medication due to her Lupus flare up. Jones Dep 199-200. She was surveilled that day. Wilson Dep 52.[4] On October 12, 2017 her medical provider at Ahuja Medical Center gave her a return to work slip writing her off from October 12, 2107 to October 16, 2016. Jones Dep 201; Jones Dep Ex Q. She forwarded it to her union representative. Jones Dep 201-202; Jones Dep Ex Q. Mrs. Jones called in sick for her next three days of work. Wilson Dep 51. Mrs. Jones traveled to Philadelphia for the conference where she was to speak on a panel about children ending up in prison. Jones Dep 203. She was still sick while in Philadelphia. Jones Dep 206. She returned to Cleveland on October 14, 2017. Jones Dep 206. She was surveilled in

_____

[4] Surveillance ordered by Mayor Sellers confirmed she was at Ahuja Medical Center on October 12, 2017. Haynes Declaration DOC#12-4, PageID#246 (Entry for October 12, 2017). .

Philadelphia. Wilson Depo 52. Mrs. Jones received an honorarium for speaking at the conference. Jones Dep 205.

From October 12, 2017 through October 15, 2017 Mayor Sellers received updates regarding the surveillance of Mrs. Jones from Ms. Wilson and Ms. Holland. Sellers Dep 70.

On Monday October 16, 2017 Mayor Sellers, Chief Haynes, Ms. Wilson and Ms. Holland (HR) met and determined that Mrs. Jones be terminated. Wilson Dep 52-54. The City placed Mrs. Jones on paid administrative leave and served her with a notice of pre-disciplinary hearing due to her attending "numerous speaking engagements which seemed contrary to the basis of your leave". Jones Dep 205; Jones Dep Ex R. (Notice of Pre-Disciplinary Hearing.) She attended a pre-disciplinary hearing on October 18, 2017 and was terminated on October 20, 2107. Jones Dep 208-210; Jones Dep Ex S. According to Ms. Wilson at some point after her termination, Mrs. Jones provided the City with an October 12, 2017 "Return to Work" slip from a medical provider at Ahuja Medical Center who wrote her off from October 12, 2107 until October 16, 2017. Wilson Dep 99-100; Plaintiff Dep Ex 14. Chief Haynes recalled that the Return to Work slip was presented to the City at the pre-disciplinary meeting. Haynes Dep 90-91. At the time of the pre-disciplinary meeting Mayor Sellers knew Mrs. Jones had called off sick and that Mrs. Jones or her union representative offered a return to work slip. Sellers Dep 83-84. '

According the Mayors Sellers, an employee may be off sick and not able to perform her duties as a police officer, but that would not preclude them from going shopping, getting on an airplane or participating in a conference Sellers Dep 73-74. According to the Mayor, an employee on sick leave cannot work any other job without his authorization. Sellers Dep 73. Mayor Seller's "real" issue was that Mrs. Jones was, according to him, paid for her appearance at the conference in Philadelphia. Sellers Dep 73-75. However, at the time he terminated Mrs.

Jones she had told him she was not paid for the Philadelphia conference, that he took her word at face value but did not know whether she had been paid for the Philadelphia conference. Sellers Dep 75, 83.

## III.    Law and Argument[5]

### A. Mrs. Jones has stated a prima facie case of First Amendment Retaliation and her engagement in constitutionally protected speech and conduct was the motivating factor in the decision to terminate her employment.

"The First Amendment prohibits retaliation by a public employer against an employee on the basis of certain instances of protected speech by the employee." *Scarbrough v. Morgan Cty. Bd. of Educ.*, 470 F.3d 250, 255 (6th Cir. 2006). "In a First Amendment retaliation claim, we must consider whether the alleged adverse employment action 'would chill or silence a person of ordinary firmness from future First Amendment activities.' "*Dye v. Office of the Racing Comm'n*, 702 F.3d 286, 303 (6th Cir. 2012) (quoting *Ctr. for Bio-Ethical Reform, Inc. v. City of Springboro*, 477 F.3d 807, 822 (6th Cir. 2007)). A termination from employment is the quintessential example of an adverse employment action. Id." *Ehrlich v. Kovack*, 710 Fed. Appx. 646, 650 (6th Cir. 2017).

""A prima facie case for a First Amendment retaliation claim raised through a 42 U.S.C. § 1983 action has three elements: "(1) the plaintiff engaged in protected conduct; (2) an adverse action was taken against the plaintiff that would deter a person of ordinary firmness from continuing to engage in that conduct" ; and (3) "the adverse action was motivated at least in part by the plaintiff's protected conduct." *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (en banc). "This inquiry is intensely context-driven: '[a]lthough the elements of a First Amendment retaliation claim remain constant, the underlying concepts that they signify will vary

---

[5] Plaintiff will not pursue her state law retaliation claim under O.R.C Chapter 4112.

with the setting.' "*Holzemer v. City of Memphi*s, 621 F.3d 512, 520 (6th Cir. 2010) (quoting Thaddeus-X, 175 F.3d at 388)." *Ehrlich v. Kovack*, 710 Fed.Appx. at 650.

In Ehrlich the court noted that "[T]o establish causation, a plaintiff must demonstrate that her protected speech is "a substantial or motivating factor" of the adverse action. Id. at 400 (quoting *Rodgers v. Banks*, 344 F.3d 587, 602 (6th Cir. 2003)). This inquiry is "essentially but-for cause." Id. (quoting *Leonard v. Robinson*, 477 F.3d 347, 355 (6th Cir. 2007)). We have adopted a burden-shifting framework for this part of the analysis. Id. Under this framework, once the plaintiff has met her initial burden of demonstrating that her speech was a substantial or motivating factor of the adverse action, the burden shifts to the defendant to show that he would have taken the same action absent the protected speech. Id. "*Ehrlich v. Kovack*, 710 Fed.Appx. at 650. Defendants have focused on this "but-for test " for causation enunciated in *University of Texas Medical Center v. Nassar,*. 133 S.Ct. 2517 (2013)(applied to Title VII retaliation claims). The Sixth Circuit has refused to extended this test to FMLA retaliation claims. *Wallner v. Hilliard,* 590 Fed.Appx. 546, 556 (6th Cir. 2014). Plaintiff contends it is equally inappropriate in a First Amendment retaliation analysis.

Defendants do not contest that Mrs. Jones July 6, 2016 Facebook post was constitutionally protected speech or conduct. The crux of this matter is whether her constitutionally protected speech and conduct was a substantial and motivating factor in the City's adverse employment action of terminating her employment while she was recuperating from a work related automobile accident and receiving benefits afforded her under the Ohio workers compensation laws. .

While some fourteen months transpired between Mrs. Jones' July 6, 2016 Facebook post and the City's decision to terminate her employment on October 20, 2017, there are material

18

facts from which a jury could determine that the City was substantially motivated by her constitutionally protected speech in its decision to terminate her. Chief Haynes initially wanted to discipline her, but Mayor Sellers determined she should not be disciplined. In response to Mrs. Jones' complaints that someone in the police department was threatening her in writing, Chief Haynes conducted an investigation and determined that Mrs. Jones authored the threatening postcard she received in her mailbox at work, and even after he enlisted the services the Ohio BCI which could not determine if the handwriting was that of Mrs. Jones, he still suspected her. It should be noted that the postcard referenced the shooting in Dallas, Texas and the shooter's mention of Mrs. Jones in his manifesto, a fact Mrs. Jones did not know until after Mayor Sellers and Chief Haynes told her. Yet the Chief still harbored an animus toward Mrs. Jones.

The intervening on-duty automobile accident and Mrs. Jones' subsequent workers compensation leave and medical treatment placed her in the spotlight with the City. As her medical treatment and injury leave continued, the City itself and its third party administrator began to question whether Mrs. Jones was truly suffering from medical conditions that precluded her from working. What was interjected into this process was Chief Haynes monitoring Mrs. Jones conduct while on injury leave. He, and his subordinates, became incredulous about Mrs. Jones participating in speaking engagements and an undercurrent arose in the police department which led Chief Haynes to express his "concern", complain, to Ms. Wilson about Mrs. Jones conduct. The speaking engagements involved issues, like her Facebook post, of public and police interactions – constitutionally protected speech. It is equally likely that the "concern" was actually a means to surreptitiously mete out retaliatory discipline for her engagement in constitutionally protected speech.

This "concern" led to surveillance, an independent medical examination and the City's determination that Mrs. Jones was fit for duty and an order that she return to work. There are material issues of fact as to whether the City actually based its decision to return her to work on the medical facts available, which demonstrate that her medical providers did not opine that she was fit for duty as of October 9, 2017, or if they were seeking to set her up, knowing she had a speaking engagement in Philadelphia, which was well publicized in City Hall, some five days after her October 9, 2017 return to work date. Additional surveillance was ordered in anticipation of the event. Mayor Sellers, who made the ultimate decision to terminate Mrs. Jones, had no issue with her taking sick leave and participating in other activities if the reason for the sick leave was such that she could not perform as a police officer. Mrs. Jones had a written excuse from a medical provider for the dates she called off and traveled to Philadelphia. The Mayor claims her terminated her because she was paid for the speaking engagement, yet at the time he terminated her he was not aware whether she was or was not paid.

A ' motivating factor' ... is one without which the action being challenged simply would not have been taken." *Greene v. Barber*, 310 F.3d 889, 897 (6th Cir.2002).  " [P]roof of an official's retaliatory intent rarely will be supported by direct evidence of such intent.... Accordingly, claims involving proof of a [defendant's] intent seldom lend themselves to summary disposition." *Bloch*, 156 F.3d at 682 (quotation marks omitted). Consequently, circumstantial evidence may provide sufficient evidence of retaliatory intent to survive summary judgment." *Holzemer v. City of Memphis*, 621 F.3d 512, 526, (Cir. 2010).

There exist disputes of material fact regarding whether the City would have terminated Mrs. Jones absent her continued engagement in constitutionally protected speech which began

with her Facebook post and, with regard to her employment, ended with her presentation at the conference in Philadelphia.

### B. Mayor Sellers and Chief Haynes are not entitled to Qualified Immunity

Government officials are immune from civil liability under 42 U.S.C. § 1983 when performing discretionary duties, provided "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982). Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions. When properly applied, it protects "all but the plainly incompetent or those who knowingly violate the law." *Malley* v.. *Briggs*, 475 U.S. 335, 341 (1986). A Government official's conduct violates clearly established law when, at the time of the challenged conduct, "[t]he contours of [a] right [are] sufficiently clear" that every "reasonable official would have understood that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).

A two-pronged test is utilized to determine whether qualified immunity shields a government official from a § 1983 claim: (1) whether the facts, viewed in the light most favorable to the nonmoving party, " show[ ] the officer's conduct violated a constitutional right; " and (2) if so, then determine whether the constitutional right was clearly established by asking whether " a reasonable official would understand that what he is doing violates that right." *Saucier v. Katz,* 533 U.S. 194, 201-02 (2001), *abrogated in part by Pearson v. Callahan,* 555 U.S. 223, 236 (2009); see also *Baynes v. Cleland*, 799 F.3d 600, (Cir. 2015).

The first prong of the *Saucier* test, requires identification of "the specific constitutional right allegedly infringed" and determine whether a violation occurred. *Graham v. Connor,* 490 U.S. 386, 394 (1989).

21

The sole question, therefore, is whether or not Mayor Sellers or Chief Haynes can appropriately say that they were each, as a "reasonable person", did not know of Mrs. Jones' First Amendment rights and that as a public employee could not be disciplined for exercising such rights. Supervisory employees of a high order must be deemed to have been aware of the restrictions imposed upon employers in terms of First Amendment rights of employees. *Meyers v. City of Cincinnati*, 979 F.2d 1154, 1155 (6th Cir. 1992).

For purposes of qualified immunity, the precise factual scenario need not have been found unconstitutional for it to be sufficiently clear to a reasonable official that his actions violate a constitutional right -- that is, for the right to be " clearly established." *Hope v. Pelzer* 536 U.S. 730, 739, 741 (2002). In fact, the Supreme Court has determined that government officials can still be on notice that their conduct violates established law even in novel factual circumstances." *Saucier v. Katz*, 533 U.S. 194, 206(2001)

Mayor Sellers agreed that Mrs. Jones was within her First Amendment rights to make her speech on Facebook. Sellers Dep 77-78. Chief Haynes complained to Ms. Wilson about Mrs. Jones' continued acts of participating in speaking engagements while on workers compensation leave. Each knew of Mrs. Jones rights to engage in speech and conduct protected by the First Amendment, yet made a decision to terminate her which was clearly motivated by her protected speech and conduct.-

**C. Mrs. Jones was subjected to a sex based hostile work environment.**

To establish a prima facie case of a hostile work environment based on gender/sex, a plaintiff must show that: (1) she is a member of a protected class, (2) she was subjected to unwelcome sexual harassment, (3) the harassment was based on her sex, (4) the harassment created a hostile work environment, and that (5) the employer is vicariously liable. *Clark v.*

*United Parcel Service, Inc.*, 400 F.3d 341 (Cir. 2005); *Hampel v. Food Ingredients Specialties, Inc.* (2000), 89 Ohio St.3d 169, syllabus at 2 (2000). Hostile work environment claims involve repeated conduct and are based on the cumulative effect on individual acts. *National Railroad*, 532 U.S. at 115. "Because the entire hostile environment encompasses a single unlawful employment practice" an employee may "base a suit on individual acts that occurred outside the statute of limitations unless it would have been unreasonable to expect the plaintiff to sue before the statue ran on such conduct." *National Railroad Passenger Corporation v. Morgan*, 536 U.S. 101, syllabus, 117-118 (2002).

In determining whether the alleged harassment is sufficiently severe or pervasive to constitute a hostile work environment a court must consider the totality of circumstances. *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 23(1993)("whether an environment is 'hostile' or 'abusive' can be determined only by looking at all the circumstances"); *Oncale v. Sundowner Offshore Servs., Inc.*, 118 S.Ct. 998, 1003 (1998); *Faragher v. City of Boca Raton*, 118 S.Ct. 2275, 2283 (1998). In *Oncale* the Court reaffirmed the principle that "[T]he real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed. Common sense, and an appropriate sensitivity to social context, will enable courts and juries to distinguish between simple teasing or roughhousing among members of the same sex, and conduct which a reasonable person in the plaintiff's position would find severely hostile or abusive." *Oncale*, 118 S.Ct. at 1003.

The treatment that Mrs. Jones endured in the workplace was clearly based upon her gender. She was the only woman in the department for a period of time. Haynes Dep 59. None of the male employees in the police department took paternity leave. Haynes Dep 59.She was

23

singled out for comments about her pregnancies, was treated less favorably during her pregnancies, was subjected to the use of the men's locker room without appropriate safeguards for her personal privacy, was not afforded the same opportunities for days off, was assigned to dispatch duties rather than road patrol while less senior males on her shift were not required to perform the dispatch duties and was subjected to comments from coworkers about not wanting more women hired into the department. She did complain to her sergeants and lieutenants about certain conduct, and even complained to Ms. Wilson. All are superiors who knew of or participated in the conduct and had a duty to report her complaints up the chain of command. Haynes Dep 12. Chief Haynes, prior to becoming Chief in 2014 or 2015 had to go to intervene on her behalf many times. Haynes Dep 58-59. However, any corrective action taken was short lived. She got to the point that she simply would not complain because when she did her treatment in the workplace would get worse and her supervisors would not take her seriously. The mistreatment on account of her gender started from the beginning of her employment with personal information relating to her sexuality was leaked to and openly  discussed in the police department and continued throughout her employment. The severe and pervasive nature of the conduct resulted in her essentially giving up on complaining because any meaningful corrective action on the part of management simply was not forthcoming.

Viewing the work environment Mrs. Jones as subjected to as a whole and considering the totality of all the facts and surrounding circumstances, including the cumulative effect of all episodes of sexual or other abusive treatment over fifteen years, establishes that there are issues of material fact as to whether the harassing conduct was "severe or pervasive" enough to affect the conditions of her employment.

**D. Mrs. Jones has stated a claim for intentional infliction of emotional distress.**

24

In order to recover on an action for intentional infliction of serious emotional stress four elements must be proved: 1) that the actor either intended to cause emotional distress or knew or should have known that actions taken would result in serious emotional distress to the plaintiff; 2) that the actor's conduct was so extreme and outrageous as to go "beyond all possible bounds of decency" and was such that it can be considered as "utterly intolerable in a civilized community," Restatement of Torts 2d (1965) 73, Section 46, comment d; 3) that the actor's actions were the proximate cause of plaintiff's psychic injury; and 4) that the mental anguish suffered by plaintiff is serious and of a nature that "no reasonable man could be expected to endure it," Restatement of Torts 2d 77, Section 46, comment j. *Pyle v. Pyle,* 11 Ohio App.3d 31, 34 (Ohio App. 8 Dist. 1983).

The manner in which Mrs. Jones was treated throughout her employment caused her to refrain from complaints about the manner in which she was treated in the workplace for fear of further retribution. The "roundtable meeting subjected her to abusive comments and treatment from her coworkers, which Mayor Sellers and Chief Haynes not only fostered, but condoned, by offering her coworkers and supervisors to express their true feelings toward her with impunity was truly extreme and outrageous. The culminating act of terminating her while she was off work due to a medical condition for which she sought treatment and had been written off work was objectively was a culminating blow to Mrs. Jones and a final, intentional act to finally and permanently remove her from the workplace.

Reasonable minds could conclude that the manner in which Mrs. Jones was treated in the workplace, particularly after she posted her commentary on Facebook constituted intentional infliction of emotional distress by her coworkers, supervisors and managers calculated to cause her emotional distress.

25

## IV.     Conclusion

For the reasons set forth herein, Plaintiff Nakia L. Jones respectfully requests that the Court overrule Defendants' motion for summary judgment and permit this matter to proceed to trial.

> Respectfully submitted,
> s/ John F. Myers
> John F. Myers (0032779)
> 275 North Portage Path #3C
> Akron, Ohio 44303
> 330-819-3695
> 330-535-0850
> johnmyerscolpa@gmail.com
> Attorney for Plaintiff

## CERTIFICATE OF SERVICE

I hereby certify that on December 31, 2018, a copy of the opposition to Defendant's Motion for Summary Judgment was filed electronically.  Notice of this filing will be sent to all registered parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

> s/ John F. Myers
> John F. Myers (0032779)
> Attorney for Plaintiff