**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**


| | | |
|---|---|---|
| Nakia L. Jones, | ) | CASE NO.  1:18 CV 647 |
| | ) | |
| Plaintiff, | ) | JUDGE PATRICIA A. GAUGHAN |
| | ) | |
| vs. | ) | |
| | ) | |
| City of Warrensville Heights, et al., | ) | Memorandum of Opinion and Order |
| | ) | |
| Defendant. | ) | |


## Introduction

This matter is before the Court upon defendants' Motion for Summary Judgment (Doc.

12).  This case arises out of the termination of plaintiff's employment.  For the following

reasons, the motion is GRANTED.

## Facts

Plaintiff Nakia Jones filed this Complaint against defendants City of Warrensville

Heights, Bradley D. Sellers (Mayor), and Wesley Haynes (Chief of Police).  Defendants Sellers

and Haynes are sued in their individual and official capacities.  The Complaint sets forth four

claims.  Count One alleges that plaintiff was terminated from her employment in violation of her

First Amendment rights. Count Two also alleges a First Amendment violation, but additionally states that the claim is brought pursuant to 42 U.S.C. § 1983. Count Three alleges gender discrimination (hostile work environment) and retaliation in violation of Ohio Revised Code § 4112. Count Four alleges intentional infliction of emotional distress. In her brief, plaintiff expressly abandons her state law retaliation claim. (Doc. 23 at 17).

The following background facts are presented to the Court.[1] Plaintiff, a female, was a patrol officer with the City of Warrensville Heights from 2002 until her termination in October 2017. Defendant Sellers has been the mayor of the City since 2011. Defendant Haynes has been the Chief of Police since 2014. At the time plaintiff was hired, there was one other female police officer and no other females were hired during the period of plaintiff's employment.

According to plaintiff, she was awakened by her college age son on July 6, 2016, who was very upset about the police shooting of Alton Sterling, an African American male in Louisiana. Plaintiff responded by posting a video that day on her private Facebook page on the subject of police shootings of African American males. Her posting "went viral."

According to Chief Haynes, he learned of the post that night from one of the sergeants who informed him that the police department was getting several calls from the media regarding the post. He went into the station that night to view the post. The next morning, upon arriving at the station, the chief was informed that "the phones in our communications center were ringing off the hook" and some news media outlets were in the parking lot. The chief called a meeting with himself, the mayor's chief of staff/personnel director (Kelli Wilson), plaintiff, and the

---

[1] Facts pertinent to the hostile work environment claim are discussed in the section addressing that claim.

mayor who communicated by phone as he was out of town. Chief Haynes told plaintiff not to report for her next shift. Plaintiff testified that she agreed with that decision. After she returned, Haynes put plaintiff on dispatch duty, rather than the road, for the remainder of the week for safety concerns due to the large volume of attention on the matter.

On July 27, 2016, plaintiff wrote a memo to the shift supervisor and Chief Haynes entitled "Safety Concerns" wherein she indicated concerns that other officers would not work with her or back her up. Additionally, she stated that she was now receiving "negative and demeaning literature" which she believed was coming from inside the department. Plaintiff acknowledged that as a result of the memo, the chief had a meeting with her and the mayor. According to Chief Haynes, plaintiff provided a postcard and a letter. The postcard accused plaintiff of stoking violence against police officers in Dallas. The typewritten letter, which states it is written by a "black police officer in an adjoining department," accused plaintiff of being a traitor. Chief Haynes investigated by sending a detective to the post office regarding the letter, but nothing was determined. He also compared handwriting on the post card to that contained in department personnel files, but only concluded that the handwriting somewhat matched plaintiff's own. A BCI review was inconclusive. The chief also received a communication from the FBI informing him that plaintiff's name had been mentioned in the Dallas shooter's manifesto. Haynes informed the mayor of such, but not plaintiff. The mayor informed plaintiff.

Mayor Sellers decided to have a "roundtable meeting"with the entire department on August 8, 2016. Everyone's concerns were to be addressed. The chief initiated the meeting by "opening the floor up to" plaintiff. Several officers expressed concerns regarding plaintiff's trip to Washington, D.C., where plaintiff sat on a White House panel. But, the chief informed the

officers that the mayor had given plaintiff permission to go. According to the chief, things calmed down after the meeting. Plaintiff testified that after the meeting, "it got a little bit better" with some officers, although there was still some friction. According to the mayor, while he looked into whether plaintiff had committed a violation by posting the video, he concluded that she did not and he did not discipline her.

Plaintiff continued her work as a patrol officer up to May 29, 2017, when she was involved in an on-duty automobile accident. She acknowledges that after the August 2016 meeting and up to this point, she suffered no adverse job actions. (Doc. 23 at 11) Plaintiff testified that she received worker's compensation and "accident on duty" pay as she was being treated for post-concussive syndrome as a result of the accident.

Kelli Wilson testified that the City's third-party administrator for worker's compensation contacted her regarding plaintiff's return to work. It is unclear exactly when this occurred. The third-party administrator believed that plaintiff should have returned and recommended surveillance. Wilson brought this information to the mayor who refused surveillance because he believed it was unnecessary. The mayor testified that this occurred around July 2017. Later, Wilson came to the mayor a second time with another request by the third-party administrator for surveillance on plaintiff. The mayor authorized the surveillance this time given that he relied on the administrator's professional opinion regarding an employee's progression through the worker's compensation system. Wilson testified that also around this time, the chief came to her with concerns that plaintiff was engaged in public speaking events while on worker's compensation leave, as well as traveling and attending weddings.

Plaintiff's exhibits show that on August 25, 2017, plaintiff's treating physician

recommended she return to work on October 16, 2017. He then extended the return to work date to November 1, 2017, based on plaintiff's request that she return when scheduled to work day shift rather than night shift. However, per a September 27, 2017 request for clarification from the third party administrator, the treating physician stated that other than not wanting to work night shift, there was no reason that plaintiff could not return to work as of that date (September 27).

The third party administrator suggested that plaintiff attend an independent medical examination (IME). She was evaluated on September 12, 2017, and was found to be fit to return to work.

Chief Haynes and Mayor Sellers testified that they were presented with the IME results and documentation from the third party administrator which included the treating physician's release to work as of September 27, and determined that plaintiff should be ordered back to work. The chief, who believed that plaintiff was clear to return to work based on the documentation, wrote a letter dated October 6, 2017, which stated that plaintiff was to report back to work on October 9, 2017, "for full duty without restrictions."[2]

Plaintiff, who was no longer on paid leave, testified that she called in sick to work on October 9 and 10 due to a headache. The mayor then decided to conduct surveillance on plaintiff on her next scheduled work day, October 13. Plaintiff testified that on October 12, she went shopping and then to her doctor who gave her pain medication for her lupus and a "time off

---

[2]     Plaintiff points to two documents which she asserts shows she was not fit for duty, but both are dated after the October 6 letter: An October 24, 2017 "Physician's Report of Work Ability" worker's compensation form which states that plaintiff is not able to return to work until December 31, 2017, and an October 12, 2017 speech therapist report which states that due to the high risk nature of plaintiff's job, she is "not yet ready to return to work."

slip" until October 16. On October 13, plaintiff called in sick for the next three work days-October 13, 14, 15, stating that she had a headache and a lupus flare up. Surveillance of October 13 showed plaintiff boarding a plane for Philadelphia. Plaintiff acknowledged that she traveled to Philadelphia to speak at a conference and returned the next day. Chief Haynes testified that a pre-disciplinary hearing was scheduled for Monday, October 16. At the hearing, plaintiff admitted she traveled to Philadelphia (a prearranged trip) on October 13, to participate in a speaking engagement. Plaintiff also submitted a "return to work" slip from her medical provider that she had seen on October 12 due to a lupus flare up which gave a return to work date of October 16. After the hearing, it was determined that plaintiff would be terminated. By letter of October 20, 2017, signed by Mayor Sellers, plaintiff was notified of her termination of employment for violating the following standards of conduct: "exercising common sense and affirmatively promoting the organization's values," "maintaining acceptable attendance and availability for work," and "dishonesty or untruthfulness." Additionally, plaintiff was found to have violated the ethical standards of the City and her oath of office.

This matter is now before the Court upon defendants' Motion for Summary Judgment.

### **Standard of Review**

Summary Judgment is appropriate when no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986) (citing Fed. R. Civ. P. 56(c)); *see also LaPointe v. UAW, Local 600*, 8 F.3d 376, 378 (6th Cir. 1993). The burden of showing the absence of any such genuine issues of material facts rests with the moving party:

> [A] party seeking summary judgment always bears the initial
> responsibility of informing the district court of the basis for its

> motion, and identifying those portions of "the pleadings,
> depositions, answers to interrogatories, and admissions on file,
> together with affidavits," if any, which it believes demonstrates the
> absence of a genuine issue of material fact.

*Celotex*, 477 U.S. at 323 (citing Fed. R. Civ. P. 56(c)).  A fact is "material only if its resolution

will affect the outcome of the lawsuit."  *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986).

Accordingly, the nonmoving party must present "significant probative evidence" to demonstrate

that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip*

*Morris Cos., Inc.*, 8 F.3d 335, 340 (6th Cir.1993).  The nonmoving party may not simply rely on

its pleading, but must "produce evidence that results in a conflict of material fact to be solved by

a jury." *Cox v. Kentucky Dep't. of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995).

The evidence, all facts, and any inferences that may permissibly be drawn from the facts

must be viewed in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co.*

*v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Eastman Kodak Co. v. Image Technical Servs.,*

*Inc.*, 504 U.S. 451, 456 (1992). However, "[t]he mere existence of a scintilla of evidence in

support of the plaintiff's position will be insufficient; there must be evidence on which the jury

could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252.

Summary judgment should be granted if a party who bears the burden of proof at trial

does not establish an essential element of his case.  *Tolton v. American Biodyne, Inc.*, 48 F.3d

937, 941 (6th Cir. 1995) (citing *Celotex*, 477 U.S. at 322).  Moreover, if the evidence is "merely

colorable" and not "significantly probative," the court may decide the legal issue and grant

summary judgment.  *Anderson*, 477 U.S. at 249-50 (citation omitted).

**Discussion**

**(1) First Amendment Retaliation**

Counts One and Two allege, through a 42 U.S.C. § 1983 action, that plaintiff was terminated in retaliation for exercising her First Amendment rights.[3]

To maintain a claim under § 1983, a plaintiff must establish that she was deprived of a right secured by the Constitution or the laws of the United States, and that the deprivation was caused by a person acting under color of state law. See *West v. Atkins*, 487 U.S. 42, 48, 108 S.Ct.2250, 101 L.Ed.2d 40 (1988); *Simescu v. Emmet County Dep't of Soc. Services*, 942 F.2d 372, 374 (6th Cir. 1991). Section 1983 "is not itself a source of substantive rights," but merely provides "a method for vindicating federal rights elsewhere conferred." *Baker v. McCollan*, 443 U.S. 137, 144 n. 3, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979). The first step in any such claim is to identify the specific constitutional right allegedly infringed. *Graham v. Connor*, 490 U.S. 386, 394, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989); *Baker*, 443 U.S. at 140.

Plaintiff's § 1983 claim is predicated on the allegation that defendants terminated her employment in retaliation for her exercise of speech protected under the First Amendment. A prima facie case for a First Amendment retaliation claim has three elements: "(1) the plaintiff engaged in constitutionally protected conduct; (2) an adverse action was taken against the plaintiff that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) the adverse action was motivated at least in part by the plaintiff's protected conduct." *Ehrlich v. Kovack*, 710 Fed.Appx. 646 (6th Cir. 2017) (quoting *Thaddeus-X v. Blatter*, 175 F.3d 378 (6th Cir. 1999)).

Although not raised by defendants, the Court must first address the liability of defendant

---

[3]    Although Count One does not mention § 1983, claims of "constitutional violations" are brought via § 1983.

8

City of Warrensville Heights. As the Sixth Circuit has explained, "[t]he question of whether a municipality is liable under § 1983 has two parts: '(1) whether [the] plaintiff's harm was caused by a constitutional violation, and (2) if so, whether the city is responsible for that violation." *Lee v. Metropolitan Government of Nashville and Davidson County*, 2011 WL 2882227 at * 12 (6th Cir. July 18, 2011) (quoting *Collins v. City of Harker Heights, Tex.*, 503 U.S. 115, 120, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992)). Under the first part of this inquiry, a municipality cannot be held liable under § 1983 "based on the actions of one of its officers when in fact . . . the officer inflicted no constitutional harm." *City of Los Angeles v. Heller*, 475 U.S. 796, 799, 106 S.Ct. 1571, 89 L.Ed.2d 806 (1986). See also *Wilson v. Morgan*, 477 F.3d 326, 340 (6th Cir. 2007)("In fact, because the jury found no constitutional violation . . . the county could not have been found liable . . . for an allegedly unconstitutional custom or policy.") A municipality, however, may be held responsible for a constitutional violation based on § 1983 where its "official policy or custom actually serves to deprive an individual or his or her constitutional rights." *Gregory v. City of Louisville*, 444 F.3d 725, 752-53 (6th Cir. 2006). The Sixth Circuit has explained the contours of municipal liability as follows:

> The Supreme Court has approved municipal liability based on § 1983 when "the [municipal] action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers," or where such actions emanate from informal governmental custom. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). In other words, the constitutional violation must have sprung from "official policy" in one form or another. Id. at 694, 98 S.Ct. 2018. As such, local government units cannot be held liable mechanically for their employees' actions under a respondeat superior theory. *Id*. at 691, 98 S.Ct. 2018. The plaintiff must "demonstrate that, through its deliberate conduct, the municipality was the 'moving force' behind the injury alleged." *Bryan Cnty. Bd. of Comm'rs v. Brown*, 520 U.S. 397, 404, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997). He "must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the

9

municipal action and the deprivation of federal rights." *Id.*

*Alman v. Reed*, 703 F.3d 887, 902-903 (6th Cir. 2013). *See also Garner v. Memphis Police Dep't,* 8 F.3d 358, 364 (6th Cir. 1993) ("[T]o satisfy the *Monell* requirements, a plaintiff must identify the policy, connect the policy to the [government entity] itself and show that the particular injury was incurred because of the execution of that policy").

Here, neither plaintiff's Complaint nor her brief have identified any particular custom, practice, or policy connected to the City of Warrensville Heights that resulted in her alleged injury. She simply does not discuss whether her particular injury was incurred because of the execution of a City policy or custom. Consequently, there can be no municipal liability under § 1983 and summary judgment is granted to the City of Warrensville Heights (and to defendants Sellers and Haynes in their official capacity[4]) on Counts One and Two.

Next, remaining defendants Mayor Sellers and Chief Haynes assert qualified immunity as to the individual capacity claims. Qualified immunity protects public officials from liability for civil damages if their conduct does not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). Where, as here, the individual defendants assert qualified immunity, the government officials may not be held liable if 1) the officers did not violate any constitutional guarantees or 2) the guarantee, even if violated, was not clearly

---

[4]     "An official capacity claim is merely another name for a claim against the municipality." *Davis v. Butler County, Ohio,* 658 Fed.Appx. 208 (6th Cir. 2016) (citations omitted). Thus, plaintiff's official capacity claim fails for the same reason as her municipal liability claim. *Id.*

established at the time of the alleged misconduct. *Arrington-Bey v. City of Bedford Heights,* 858 F.3d 988 (6th Cir. 2017) (citations omitted). Defendants argue that they did not violate any constitutional right. For the following reasons, this Court agrees.

As stated above, plaintiff claims that she was terminated from her employment in retaliation for exercising her First Amendment rights by engaging in constitutionally protected speech. Defendants argue that plaintiff fails to establish a prima facie case of her claim because she cannot show that her termination was motivated at least in part by the protected conduct. In particular, plaintiff posted her Facebook video in July 2016, and was not terminated until October 2017. Furthermore, not only did more than a year pass between her speech and her termination, but defendants assert that the evidence shows that plaintiff would have been terminated absent the speech given that she called in sick but boarded a plane instead. As recognized by *Ehrlich, supra,* failure to establish causation (the third element in a First Amendment retaliation claim) supports the grant of summary judgment to defendant. As also recognized by the Sixth Circuit in that case, "To establish causation, a plaintiff must demonstrate that her protected speech is a 'substantial or motivating factor' of the adverse action." *Ehrlich*, 710 Fed.Appx. at 650 (citations omitted).

Plaintiff argues that there are material facts from which a jury could determine that her termination was substantially motivated by her protected speech. She points to the following.

• Kelli Wilson testified that Chief Haynes wanted to discipline plaintiff for the Facebook post but Mayor Sellers did not want to discipline her for it. Plaintiff gave the chief the postcard accusing her of stoking violence against police officers. The chief conducted an investigation and concluded that the handwriting on the postcard matched plaintiff's.

11

But, a BCI review was inconclusive. Plaintiff concludes that the chief "still suspected her" and "still harbored an animus" toward her. (Doc. 23 at 19)

- Plaintiff was subsequently injured in the on-duty accident and placed on worker's compensation leave. Plaintiff asserts that this "placed her in the spotlight with the City." (Doc. 23 at 19) She asserts that the City and the third party administrator began to question whether she truly suffered from medical conditions which prevented her from working. The chief began to monitor her conduct. The chief and his subordinates became concerned with plaintiff's speaking engagements which were constitutionally protected speech. Plaintiff maintains that the concern with the speaking engagements led to the surveillance and the IME.

- Plaintiff maintains that there are issues of fact as to whether the City actually based its return to work order on the medical facts available which show that plaintiff's medical providers did not opine that she should return to work on October 9, 2017. Plaintiff also surmises that it was well-publicized that she had a speaking engagement in Philadelphia five days after the return to work date, and additional surveillance was ordered "in anticipation of the event." (Doc. 23 at 20) Plaintiff had a written excuse from a medical provider for the dates that she called off work and traveled to Philadelphia.

For the following reasons, the Court agrees with defendants that plaintiff has not shown an issue of fact as to causation.

First, there is no temporal proximity between the July 2016 Facebook post and plaintiff's October 2017 termination. Clearly, the passage of more than one year is outside any boundary of temporal proximity.

Second, plaintiff attempts to avoid the problem created by the passage of more than one year between her Facebook post and her termination by arguing that her other various speaking engagements were also protected activity. Plaintiff states that these "speaking engagements involved issues, like her Facebook post, of public and police interactions." (Doc.23 at 19) But, plaintiff testified that she had been "speaking before this video went viral" and she acknowledges that no adverse action was taken against her until her termination. Furthermore, plaintiff was not disciplined for participating in the Washington, D.C. meeting although she had called in sick to attend. And, plaintiff admits she suffered no adverse job actions between the roundtable meeting in August 2016 and her car accident in May 2017, although she engaged in "speaking" throughout that time.

Third, plaintiff asserts that after the chief reported to Wilson that he and the other officers were "concerned" that plaintiff was participating in speaking engagements while on worker's compensation leave, Wilson approached the mayor a second time requesting the surveillance and this time he agreed to it. However, Wilson's testimony merely acknowledges that these two events happened around the same time. Rather, Wilson's testimony makes clear that it was the third party administrator's idea to conduct the surveillance and the mayor only agreed after the second request. The mayor also testified that it was the third party administrator who raised concerns to Wilson regarding plaintiff's leave and suggested the surveillance. The mayor initially denied the request for surveillance but approved it after the third party administrator requested it a second time. Furthermore, the chief testified that it was not only the speaking engagements that had caused concern during plaintiff's leave, but also her traveling to Florida and attending weddings.

Fourth, plaintiff speculates that the chief continued to be suspicious of her and harbor animosity based on the issue of the postcard.[5] This is without basis. Not only did these events occur more than a year before plaintiff's termination, but it was plaintiff who asked the chief to address the postcard. Additionally, the chief participated in the August 2016 "roundtable meeting" which gave everyone in the department the opportunity to air their concerns. After several officers expressed concern regarding plaintiff's upcoming trip to sit on a White House panel, the chief informed the officers that the mayor had given plaintiff permission to go. This weakens plaintiff's argument that the chief held animus toward her. Moreover, even plaintiff admitted that things improved after the meeting and no adverse actions were taken against her. Plaintiff speculates that the chief investigated and built up a case against her while she was out on medical leave. But, plaintiff did not go out on medical leave as a result of her accident until nine or ten months after the issue of the postcard and the roundtable meeting. Furthermore, there is no evidence that the chief asked for the surveillance, but rather, as discussed above, the third party administrator requested it.

Fifth, plaintiff attempts to undermine the decision to terminate her by calling into question whether defendants truly relied on "the medical facts available." (Doc. 23 at 20) Plaintiff seems to be arguing that defendants came up with the return to work date of October 9, because they knew she had a speaking engagement in Philadelphia on October 13. But, it is undisputed that the September 2017 IME cleared plaintiff to work and plaintiff's treating physician indicated she could return to work as of September 27. Even assuming the medical evidence that defendants had before them did not justify a return to work date of October 9, there

---

[5] Plaintiff acknowledges that the mayor made the decision to terminate her.

is no evidence that plaintiff contacted the chief or the mayor to discuss whether she was fit to return to work after she received the October 6 letter from the chief instructing her to report back to work on October 9. Rather, she called in sick to work on October 9 and 10 due to a headache. She again called in on October 13 (for the next three days) stating that she had a headache and a lupus flare up. Instead, she boarded the plane on October 13. Plaintiff was terminated for fraud/deception. The mayor testified that at least two other City employees had been terminated for fraudulent use of sick leave.

Because there is no causal connection between plaintiff's protected speech and her termination, and defendants have demonstrated that there was a legitimate reason for the decision, Counts One and Two are dismissed.

### (2) State law hostile work environment claim

Plaintiff argues she was subjected to a hostile work environment based on her gender during the course of her 15 year employment with the City. Initially, plaintiff does not dispute that individual defendants Mayor Sellers and Chief Haynes are not "employers" subject to liability under Ohio Revised Code § 4112. Summary judgment is granted to defendants on this basis. *Hauser v. Dayton Police Department*, 140 Ohio St.3d 268 (2014), (O.R.C. § 4112.01(A)(2) and 4112.02(A) do not expressly impose liability on political subdivision employees; rather, political subdivision employers are subject to vicarious liability for the discriminatory acts of their employees.) Therefore, the claim remains pending against the City only.

To recover on a hostile work environment claim, plaintiff must show that: (1) she was a member of a protected class; (2) she was subjected to unwelcome sexual harassment; (3) the

harassment complained of was based on sex; (4) the charged sexual harassment was severe or pervasive enough to create a hostile work environment; and (5) the employer failed to take reasonable care to prevent and correct any sexually harassing behavior. *Daniels v. Pike County Commissioners,* 706 Fed.Appx. 281 (6th Cir. 2017) (citing *Williams v. General Motors Corp.,* 187 F.3d 553 (6th Cir. 1999)). A hostile work environment occurs "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Id.* The conduct must be so severe or pervasive that both a reasonable observer and the actual victim would perceive the environment as abusive. Because federal case law interpreting Title VII is generally applicable to sexual harassment claims under Ohio state law, the Court applies the federal legal framework to plaintiff's state law claim. *Hawkins v. Anheuser–Busch, Inc.*, 517 F.3d 321, 332 (6th Cir. 2008).

Plaintiff points to the following facts in support of her hostile work environment claim. All facts are taken from her deposition testimony.

At the time she was hired, there was one other female officer. No other females were hired during plaintiff's tenure. Plaintiff found out that answers to her polygraph test, administered as part of the hiring process, had been leaked in the department which included answers to sexually explicit questions.

A few of her lieutenants were "extremely disrespectful and would treat me different than others in our department." For instance, during her first pregnancy she had been sick and was in a car accident. Lieutenant Curtin put her on dispatch light duty which she had no objection to. But, he also told her she would be doing "jail check." He had not required the other female

16

officer to do so when she was pregnant. Another officer complained to the chief on her behalf and she was then told that she did not have to do the "jail check." After that, Lieutenant Curtin did not cause her other problems. Lieutenant Kerling was "condescending and very disrespectful to women." Plaintiff complained to Kelli Wilson that Kerling was disrespectful and "always had an issue with" her. Wilson told plaintiff that she informed the mayor, but nothing changed.

After plaintiff was hired, she asked the chief if the female officers had a separate place to change because there was only a male locker room. "I mean it doesn't say male on the door, but we know it's an all male facility." Plaintiff would change at home and use the public restroom at City Hall. It was decided that a sign would be put on the door which could be flipped depending on whether males or females were inside. Once a male co-worker kicked the door open when she was inside and so she never changed in there again. Other times, males flipped the sign from female to male while plaintiff was inside.

Plaintiff complained that male officers on prior shifts left her car messy and once left a Scene Magazine with a picture of a woman in lingerie. At one point, Lieutenant Curtin told plaintiff he was going to write her up for having a messy car. Plaintiff talked with him and explained that the male officers left her car messy. Curtin was agitated, but said he would speak to her sergeants. Two weeks later, plaintiff found a pocket knife under the seat of her assigned car. She knew it belonged to Curtin, and she turned it in.

Lieutenant Kerling had a board in his office with "derogatory" pictures of some of the officers. One pictured an hispanic officer with a sombrero and one was of plaintiff "looking like I was throwing up." There were other depictions which were "jokes about every officer."

During plaintiff's first or second pregnancy, Sergeant Senft remarked that plaintiff did

not "know how to use condoms." Plaintiff told her sergeant but said that she did not want a formal complaint filed. During two of her pregnancies, the lieutenant would purposely switch her shifts from day to nights. It took two doctor's notes to be put on a regular shift. During her last pregnancy, the sergeant put a bloody, pepper sprayed suspect in her cruiser rather than in his own car.

Plaintiff believed she was treated differently than the males. John Videc, who relieved her, was almost always late but never written up. Plaintiff was written up when she was late for a shift. Plaintiff also states that she was almost always placed in dispatch rather than on the road, although she was senior, because she is a woman. In 2014 and 2015, she was the only officer on her shift "doing domestic violence for police reports and arrests." The other officers did not want to arrest the male perpetrators. Plaintiff complained to her supervisors. Plaintiff was also the one doing all the domestic violence reports.

Manpower was low which resulted in everyone fighting for the time off. But, the males would speak among themselves and decide who would get the day off rather than fairly publishing the schedule. As with the other issues, plaintiff spoke with her supervisor but the situation did not change. Plaintiff also felt that the males made her feel as though she had an "attendance problem" because she had to take time off for three pregnancies and her lupus even though "a lot of them all have as much time as me."

In August 2017, during roll call, a co-worker remarked that he hoped the department did not hire any more females because they are useless. The next day, the co-worker told plaintiff that he hoped plaintiff was not offended by what he said and that he was not talking about her. In general, plaintiff felt as though everything she did was "amplified" or "blown out of proportion."

Plaintiff argues that considering the cumulative effect of all these instances occurring in her work environment, there are issues of fact as to whether the harassing conduct was severe or pervasive enough to affect the conditions of her employment.

For the following reasons, the Court agrees with the City that summary judgment is warranted on this claim because plaintiff has failed to establish a prima facie case. Not only are many of plaintiff's assertions based on conclusory or speculative facts, but some are simply wholly subjective beliefs. Additionally, many of the incidents plaintiff relies on are not based on her sex. Further, the incidents simply do not rise to the level of severity or pervasiveness required to set forth a claim.

Although the Court is mindful that it considers the "totality of the circumstances," plaintiff discusses events over the course of her 15 years of employment. While it must not "disaggregate the alleged incidents of harassment," the Court must examine the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Daniels,* 706 Fed.Appx. at 289 (citations omitted).

Many of the portions of testimony relied upon by plaintiff to show that she worked in a hostile work environment based on her sex are conclusory statements, subjective beliefs, or based on rumor including the following: the issues with her polygraph test; her opinion that certain supervisors were disrespectful or condescending; the issue with the messy car and the lingerie advertisement; the insinuation that the lieutenant left a pocket knife under the seat of the car to intimidate plaintiff after she complained that the other men left her squad car messy; the speculation that her male co-workers were deciding among themselves as to who would get time

19

off; the "feeling" that the males thought plaintiff had an "attendance problem"; and the "feeling" that everything she did was amplified or blown out of proportion. Additionally, plaintiff's opinion that John Videc was "always late" but never written up while she was written up is unsupported by anything other than her own speculation.

Some of the incidents are not based on sex. The harassment must be "precipitated by anti-female animus" or would not have occurred "but for the employee's gender." *Daniels,* 706 Fed.Appx. at 287-288 (citations omitted). The fact that a lieutenant required plaintiff to perform jail checks while pregnant was probably not based on sex because plaintiff also testified that the other female officer was not made to do so while pregnant. The "derogatory" pictures on the board in the lieutenant's office included males as well as females. The Court cannot say that the fact that while she was pregnant, the lieutenant would "purposely" switch her shifts and a sergeant put a pepper-sprayed and bloody suspect in her cruiser rather than his own would not have occurred but for plaintiff's gender.

The remaining incidents are just not sufficiently severe to amount to an unreasonable interference with plaintiff's work performance. The issue with the changing room is not sufficiently threatening or humiliating and, in fact, defendant attempted to address the situation with the limited amount of funding that it had. The comment about the condoms (which appears to have been made outside plaintiff's presence) and the statement that no more females should be hired were certainly "isolated incidents" or "offhand comments" which do not amount to discriminatory changes to the terms of employment. *Daniels,* 706 Fed.Appx. at 289 (citations omitted). Finally, even assuming plaintiff's belief is true that she was "always placed on dispatch" and "was the only officer on her shift" doing domestic violence reports because she is

a woman, the Court is unable to truly weigh the frequency of the incidents and cannot say that they were *objectively* hostile or abusive. *Harris v. Forklift Sys., Inc.,* 510 U.S. 17 (1993) (The conduct must be severe or pervasive enough to create an objectively hostile or abuse work environment.)

For all these reasons, summary judgment is granted on the sex based hostile work environment claim.

### (3) intentional infliction of emotional distress

Plaintiff argues that the manner is which she "was treated throughout her employment" and "particularly after she posted her commentary on Facebook constituted intentional infliction of emotional distress by her co-workers, supervisors, and managers." (Doc. 23 at 25) Plaintiff maintains that the way she was treated throughout her employment caused her to refrain from complaining for fear of retribution. She also asserts that she was subjected to abusive comments during the roundtable meeting. Finally, she states that "the culminating act" of her termination amounted to intentional infliction of emotional distress.

To prevail on a claim for intentional infliction of emotional distress under Ohio law, a plaintiff must prove:

> a) that the actor either intended to cause emotional distress or knew or should have known that actions taken would result in serious emotional distress to the plaintiff; b) that the actor's conduct was extreme and outrageous, that it went beyond all possible bounds of decency and that it can be considered as utterly intolerable in a civilized community; c) that the actor's actions were the proximate cause of the plaintiff's psychic injury; and d) that the mental anguish suffered by plaintiff is serious and of a nature that no reasonable person could be expected to endure it.

*Pyle v. Pyle*, 11 Ohio App. 3d 31 (8th Dist. 1983).

Initially, plaintiff does not dispute that Mayor Sellers and Chief Haynes are entitled to

immunity under O.R.C. § 2744.03(A)(6).  Accordingly, summary judgment is granted to those defendants on this claim.  Nor does plaintiff dispute that employment termination alone cannot support a claim for intentional infliction of emotional distress. *See Shoemaker-Stephen v. Montgomery County Bd. of Com'rs,* 262 F.Supp.2d 866, 888 (S.D.Ohio 2003).  Moreover, the Court simply cannot conclude that the evidence discussed herein amounts to extreme and outrageous conduct that "went beyond all possible bounds of decency" so that it can be considered "utterly intolerable." Finally, plaintiff has not presented evidence of mental anguish as a result of her employment or the roundtable meeting.

Summary judgment is granted to defendants on this claim.

**Conclusion**

For the foregoing reasons, defendants' Motion for Summary Judgment is granted.

IT IS SO ORDERED.


 /s/ Patricia A. Gaughan
PATRICIA A. GAUGHAN
United States District Court
Chief Judge

Dated: 3/5/19